BURLINGTON MEMORIAL HOSPITAL, Door County Memorial Hospital, Elmbrook Memorial Hospital, Family Hospital, Milwaukee, Memorial Hospital at Oconomowoc, Sacred Heart—St. Mary's Hospitals, Inc., Rhinelander, St. Clare Hospital, Monroe, St. Elizabeth Hospital, Appleton, St. Joseph's Hospital, Marshfield, St. Joseph's Hospital, Milwaukee, St. Luke's Hospital, Milwaukee, St. Mary's Hospital Medical Center, Green Bay, St. Mary's Medical Center, Racine, St. Michael's Hospital, Milwaukee, St. Michael's Hospital, Stevens Point, Trinity Memorial Hospital, Cudahy, Two Rivers Community Hospital, Plaintiffs,

v.

Otis BOWEN, Secretary of the United States Department of Health and Human Services, and Wisconsin Peer Review Organization, Inc., Defendants.

No. 86–C–35–C.

United States District Court, W.D. Wisconsin.

Oct. 2, 1986.

Robert A. Wilmot, Daniel Miller, and Ronald Mohorek, Purtell, Purcell, Wilmot & Burroughs, S.C., Milwaukee, Wis., for plaintiffs.

Rebecca A. Erhardt, Boardman, Suhr, Curry & Field, Madison, Wis., for Wis. Peer Review Organization.

David Sarnacki, Asst. U.S. Atty., Madison, Wis., for Otis Bowen.

## ORDER

CRABB, Chief Judge.

This is a civil action for declaratory and injunctive relief in which the plaintiff hospitals are challenging the authority of the defendant Secretary of Health and Human Services to enforce a regulation requiring the plaintiffs to incur without reimbursement certain administrative costs of peer review of their treatment of Medicare patients. Jurisdiction is present under 28 U.S.C. § 1331.

The regulation at issue is 42 C.F.R. § 466.78(b)(2), which provides in pertinent part that hospitals seeking reimbursement for services provided to Medicare beneficiaries must

Provide patient care data and other pertinent data to the [peer review organization] at the time the [peer review organization] is collecting review information that is required for the [peer review organization] to make its determinations. When review is performed away from the facility, the facility must photocopy and deliver to the [peer review organization], without charge, all required information within 30 days of a request.

When the [peer review organization] does post-admission, preprocedure review, the facility must provide the necessary information before the procedure is performed, unless it must be performed on an emergency basis.

The plaintiffs contend that this regulation is invalid for several reasons. First, it conflicts with the language of 42 U.S.C. § 1395cc(a)(1)(F), which provides that the Secretary of Health and Human Services is to pay all the costs of peer review incurred by hospitals. Second, by imposing an unreimbursed charge upon hospitals serving Medicare patients, the regulation will force hospitals to shift the charge to non-Medicare patients in violation of the provisions of 42 U.S.C. § 1395x(v)(1)(A), prohibiting such shifting of costs. Third, the promulgation of the regulation by defendant Bowen's predecessor was arbitrary and capricious because it is unsupported by any evidence in the administrative record and is based on inaccurate assumptions.

In opposition to the plaintiffs, the Secretary contends that his department's interpretation of the Medicare statute is a reasonable one and, as such, is entitled to deference from the court; that the regulation was based on substantial evidence that photocopying costs would be compensated adequately under the administrative costs component of the prospective payment system, which is intended to replace the old cumbersome system of reimbursing Medicare providers retroactively for their actual costs; and that 42 U.S.C. § 1395cc(a)(1)(F) does not require reimbursement of photocopy costs.

For its part, defendant Wisconsin Peer Review Organization (WiPRO) contends that the plaintiffs have no actual controversy with it now that the parties are operating under an interim memorandum of understanding that states simply that WiPRO agrees to perform review services for the plaintiffs as required under the Medicare act and regulations.

The plaintiffs and defendant Bowen have moved for summary judgment. I construe defendant WiPRO's assertion of a lack of a live controversy as a motion to dismiss the complaint against it. For the purpose of deciding those motions, I find that there is no genuine issue with respect to the following material facts.

## FACTS

Plaintiffs are seventeen nonprofit, nonstock, tax exempt Wisconsin corporations located in the State of Wisconsin. Each is a fully qualified and certified provider of hospital services under the Medicare Act, 42 U.S.C. § 1395cc.

Defendant Otis Bowen is Secretary of the Department of Health and Human Services of the United States of America. As such, he is responsible for the administration of the Medicare program under the Medicare Act, 42 U.S.C. § 1395 *et seq.*

Defendant Wisconsin Peer Review Organization, Inc. (WiPRO) is a nonprofit Wisconsin corporation with its principal place of business located at 330 East Lakeside Street, Madison, Wisconsin. WiPRO is a utilization and quality control peer review organization as defined in 42 U.S.C. § 1320c–1, which has been awarded an exclusive contract by the Secretary of the Department of Health and Human Services through the Health Care Financing Administration, pursuant to 42 U.S.C. § 1320c–2(b), to perform peer review of the services that Medicare providers render to Medicare beneficiaries in the State of Wisconsin.

On September 3, 1982, Congress amended the Social Security Act and the Medicare Act by creating 42 U.S.C. § 1320c–2, which requires that the Secretary of Health and Human Services enter into contractual agreements with utilization and quality control peer review organizations for the purpose of reviewing the services provider hospitals render to Medicare beneficiaries to determine whether services provided under the Medicare program are medically necessary, conform to appropriate professional standards of care, and are delivered in the most efficient and economical manner.

The peer review organizations were created to replace professional standards review organizations which had performed peer review of services rendered to Medicare beneficiaries since 1972.

On April 20, 1983, Congress amended the Medicare Act by creating 42 U.S.C. § 1395cc(a)(1)(F), which requires that in order to retain their status as providers under the Medicare program, providers of inpatient hospital services must enter into an agreement with a professional standards review organization or with a utilization and quality control peer review organization. In order to retain their status as providers and their entitlement to receive payment for services rendered to Medicare beneficiaries under the Medicare program, plaintiffs were required to enter into a contract with WiPRO no later than November 15, 1984, permitting WiPRO to review the services plaintiffs provided to Medicare beneficiaries. Each of the plaintiffs has signed a Medicare Provider Participation Agreement with the Health Care Financing Administration, the administrative agency through which defendant administers the Medicare program.

Plaintiffs' status as Medicare providers could be terminated if they do not comply with all provisions and regulations of the Medicare Act, 42 U.S.C. § 1395cc(b)(2), including the provision requiring them to waive all compensation for services rendered to Medicare beneficiaries other than that compensation provided and permitted by the Medicare Act. 42 U.S.C. § 1395cc(a)(1)(A).

On July 17, 1984, the Secretary of Health and Human Services and the Health Care Financing Administration published in the *Federal Register* a notice of proposed rulemaking regarding implementation of the peer review organization program. In a summary of the proposed rules, the Secretary indicated that they were designed (1) to implement portions of the Peer Review Improvement Act of 1982 and the Social Security Amendments of 1983 by establishing the review functions to be performed by utilization and quality control peer review organizations, and (2) to outline the relationships among peer review organizations, medical fiscal intermediaries and carriers, providers, practitioners, and beneficiaries after the peer review organizations assumed the review functions for provider hospitals under the prepayment system. In the notice of proposed rulemaking, the Secretary stated that unlike the former professional standards review organizations, peer review organizations were prohibited from delegating review functions to providers.

The Secretary's notice of proposed rulemaking included a proposal to create a regulation, 42 C.F.R. § 466.78(b)(2), that specified that providers must cooperate with peer review organization review, must photocopy and deliver at no charge to the peer review organization patient care data and other pertinent data requested by the peer review organization, and may not charge the peer review organization for the photocopies.

The notice of proposed rulemaking provided that public comments would be considered prior to promulgation of the final rule if such comments were received by August 16, 1984.

On or about July 23, 1984, six days after the notice of proposed rulemaking, the Health Care Financing Administration entered into an exclusive contract with WiPRO, pursuant to 42 U.S.C. § 1320c-2, to review inpatient hospital services provided to Medicare beneficiaries in the State of Wisconsin.

On August 6, 1984, ten days prior to the deadline for submitting comments concerning the notice of proposed rulemaking, the Health Care Financing Administration issued peer review organization Program Directive Number 2 to all peer review organizations, including WiPRO. The directive required that the contract between WiPRO and providers specify that provider hospitals must photocopy and deliver, without cost to WiPRO, all patient care records needed by WiPRO to perform its review functions for those reviews it chooses to conduct away from the provider's facilities.

Through Program Directive No. 2, the Health Care Financing Administration required the plaintiffs to agree to provide, without cost to WiPRO, all photocopies WiPRO required for the purpose of conducting peer review. This condition was imposed prior to the deadline for submitting comments to the Secretary's Notice of Proposed Rulemaking regarding the creation of 42 C.F.R. § 466.78(b)(2).

Pursuant to their obligations as Medicare providers specified in 42 U.S.C. § 1395cc(a)(1)(F), each of the plaintiffs executed an agreement referred to as the "Memorandum of Understanding" with WiPRO on or about November 15, 1984. The agreement was to remain in effect until June 30, 1986. Section XII of the memorandum of understanding reserves expressly the right of the Medicare providers to challenge any provision or obligation under the memorandum of understanding that conflicts with the Social Security Act. Also it provides that neither party shall be bound by any provision or obligation based upon any regulation or directive that is invalid under the Social Security Act. Section IV. C. of the memorandum of understanding provides that WiPRO intends to perform most of its reviews onsite and that in the event of a change in such policy, WiPRO shall give hospitals reasonable notice of the revised procedures, and an opportunity to negotiate an alternate means of access to records.

On April 17, 1985, the Secretary published final rules implementing portions of the Peer Review Improvement Act of 1982 and the Social Security Amendments of 1983. The Secretary's notice of final rulemaking included the rule creating 42 C.F.R. § 466.-78(b)(2), requiring provider hospitals to provide photocopies without cost to peer review organizations for the purpose of offsite review, effective May 17, 1985.

In response to the Secretary's notice of proposed rulemaking regarding 42 C.F.R. § 466.78(b)(2), commenters objected to the regulation on several grounds.

1. The Secretary had directed the imposition of photocopy costs upon hospitals without charge to the peer review organizations prior to receipt and consideration of the public comments submitted in response to the notice of proposed rulemaking.

2. The photocopy regulation effectively shifted the costs of peer review activities onto hospitals and away from peer review organizations and the Health Care Financing Administration, in conflict with 42 U.S.C. § 1395cc(a)(1)(F).

3. The prospective payment system did not incorporate into the cost data for the 1981 and 1982 base years the photocopy costs providers would incur under the peer review organization system. Thus, the cost of complying with the photocopy regulation would not be compensated by the Medicare program.

4. The photocopy regulation operated to shift to non-Medicare patients the costs that the providers incurred as participants in the Medicare program.

5. The Secretary had failed to require peer review organizations to perform reviews onsite as often as possible and had failed to place any limit on the volume of photocopies that could be required of provider hospitals.

6. The Secretary had failed to follow the provisions of 42 U.S.C. §§ 1320c-3, 1320c-5, and 1395cc(a)(1)(B), that place an express limit on peer review organization access to medical records maintained by providers.

7. 42 U.S.C. § 1395cc(a)(1)(F) provides that all costs of peer review, including providers' costs, should be considered costs incurred in providing inpatient services under Part A of the Medicare program and paid for from the Federal Hospital Insurance Trust Fund, thereby making a hospital's compliance costs recoverable from the peer review organization with the peer review organization authorized to pass these costs through to the Health Care Financing Administration.

In the Basis and Purpose statement published with the notice of final rulemaking, the Secretary acknowledged that twenty-four commenters objected to the require-

ment that hospitals photocopy and deliver pertinent information to the peer review organization on the ground that this regulation would increase hospitals' operating costs without reimbursement from the peer review organization or the Secretary through the prospective payment system. The Secretary acknowledged that commenters had stated that peer review organizations should be required to conduct onsite reviews at the hospital whenever possible and also that commenters had suggested that the regulations impose some limitations on the volume of material a peer review organization could request from a provider hospital.

In response to these comments the Secretary stated:

> We believe it is important that [peer review organizations] have adequate access to medical records to enable them to carry out required activities. This includes the right to request and receive copies as they deem necessary, including preadmission test records. In some cases, this will mean that the [peer review organization] will request hospitals to photocopy specific medical records and mail them to the [peer review organization].

> The prospective payment rates are computed according to the provisions of the law and are also based on the best available data at the time of computation. Administrative costs are included in the Federal and hospital specific portions of prospective payments by virtue of their being incurred and reported by hospitals for the years that represent the data bases for the prospective payment system.

> Prior to the use of [peer review organizations], review of inpatient hospital services was carried out either at the hospital or offsite. Offsite review sometimes required that the hospital mail patient records to Medicare fiscal intermediaries. These costs were subsumed in the hospital's administrative costs which in turn were reflected in Medicare cost reimbursement. Costs related to such activi-

ties are accounted for, in some measure, in the prospective payment base rates.

> We also believe that the fiscal benefits of [peer review organization] review will compensate for any such increased costs. For example, in many cases, [peer review organization's] preadmission review activities will protect hospitals from retrospective denials. Thus, there will be trade-offs between a hospital's cost of providing medical records to a [peer review organization] and the [peer review organization's] performance of review, that, in many cases, may assist hospitals in avoiding unnecessary expenditures.

> We agree that the confidentiality of copied records is important and we plan to publish final regulations concerning [peer review organization's] protection of photocopied records as separate regulations.

Administrative Record at page 5.

The Secretary did not refer to any statistical data or analysis supporting his contention that the costs of photocopies necessary for peer review organization review were compensated through the prospective payment rates by virtue of their being incurred and reported by hospitals for the years that represent the data bases for the prospective payment system. The Secretary's Notice of Final Rulemaking did not include a fiscal impact analysis regarding the effect of the administrative regulations. The Secretary did acknowledge:

> However, even given these qualifications, we can identify several areas of potential impact that may result from implementing the [peer review organization] program. In summary, they include:

> A potential increase in reporting, recordkeeping and photocopying burdens that were not specifically part of the prospective payment rate calculations. As explained earlier in the preamble, collection of this information is necessary for [peer review organizations] to make determinations that the items and services provid-

ed by a facility are necessary and appropriate.

Administrative Record at page 14.

Under the prior system of professional standards review organization review, the professional standards review organization either performed the reviews itself or delegated review functions to inhouse hospital staff, by designating the hospital's Utilization Review Committee to act as the organization's agent to conduct reviews of health care services on its behalf. Delegated and nondelegated hospitals had substantially different costs associated with peer review and received different reimbursement for those costs.

Delegated hospitals had their direct costs reimbursed on a cost per unit basis by the fiscal intermediary. Direct costs included the cost of the physician advisor and nurse coordinator who actually performed the reviews, the technical support personnel (including medical record employees who organized the records), and any travel costs incurred in the review process. Indirect costs were reimbursed through the Medicare Cost Report by inclusion in the "administrative and general cost center," on the basis of the provider's Medicare utilization rate (the ratio of Medicare patient days to total patient days). Indirect costs included the costs of space (rent, heat, light, janitorial services) used for peer review activities and other costs including photocopying of documents such as those necessary for

(1) the development and issuance of denial notices (42 C.F.R. § 466.16);

(2) the processing of denial reconsiderations and appeals (42 C.F.R. Part 473, Subpart A);

(3) the issuance of sanction reports (42 C.F.R. Part 474, Subpart B);

(4) the conduct of medical care evaluation studies (42 C.F.R. § 466.18);

(5) the professional standards review organization's monitoring of a hospital's capability to perform delegated review (42 C.F.R. § 466.36); and

(6) the financial and statistical analyses necessary for the negotiation and reimbursement of the delegated hospital's review cost (42 C.F.R. § 466.62). Except for the photocopying of these documents, delegated hospitals did not have to make photocopies for peer review purposes. Since they performed their review onsite, they had no need to make photocopies of medical records for review by the professional standards review organization. Only those nondelegated hospitals that had reviews performed offsite incurred indirect costs that included the cost of photocopying some medical records.

Sixteen of the seventeen plaintiff hospitals performed delegated peer review throughout the period of time the professional standards review organization system was in effect.

Both direct and indirect costs incurred by delegated hospitals were paid directly from the Medicare Trust Fund and were not the subject of annual appropriations. Non-delegated hospitals also had their indirect costs of peer review activities reimbursed through the administrative and general cost center in the Medicare cost report based on Medicare utilization. The non-delegated review of Medicare services was performed by the professional standards review organization itself. The direct costs incurred by the organization for this review were reimbursed on the basis of a unit cost rate for the review of each admission. These costs were funded directly from the Medicare Trust Fund and were not subject to annual appropriations. In contrast, the indirect administrative costs of review incurred by the professional standards review organization were calculated separately and were funded through the annual appropriations process. In other words, under the professional standards review organization system, all of the direct and indirect costs of peer review, whether incurred by delegated hospitals, nondelegated hospitals, or professional standards review organizations, were reimbursed from the Trust Fund, with the exception of the indirect administrative costs incurred by the professional standards review organization.

Currently, provider hospitals are reimbursed for rendering inpatient services to Medicare beneficiaries through the prospective payment system. Under the prospective payment system, Medicare reimbursement is determined according to predetermined rates based on per-patient amounts calculated by reference to a particularly diagnosed illness. Illnesses are categorized by diagnostic related groups which are weighted in direct relation to the cost of provider services for the average case within any particular diagnostic related group. Provider reimbursement for the treatment of any particular illness is determined in advance of admission by adding a standardized payment amount calculated in part on a regional basis and in part on a national basis (federal portion) to a hospital specific cost amount (hospital portion) and multiplying the result by a weighting factor for the particular diagnostic related group. The federal portion of the prospective payment rate is computed on the basis of hospital cost report data for fiscal years ending in 1981. The hospital specific portion of the prospective payment rates is calculated on the basis of hospital cost report data for fiscal years ending on or after September 30, 1982 and before September 30, 1983.

The critical feature of the new system is that the prospective payment rates are to be fixed in advance of the provision of services so that hospitals will be certain of the amount they will receive for their operating costs. The estimated average cost of treatment in the base year derives from a hospital's allowable operating costs for that year, and is adjusted upwards based upon the Secretary's estimates of factors such as anticipated inflation. By 1988, this estimated average cost will be a uniform national average.

In order to minimize disruptions that might otherwise occur because of a sudden change in reimbursement policy, Congress established a three-year transition period, during which an individual hospital's own historical average costs, as well as regional and national average costs, combine to make up the "average cost." As originally promulgated, for a provider's first fiscal year under the prospective payment system, the hospital specific portion multiplied by the diagnostic related group forms 75% of the total payment, while the federal portion multiplied by the diagnostic related group forms 25% of the total payment. For the hospital's second prospective payment system fiscal year, the hospital specific portion is 50% and the federal portion is 50%. For the third prospective payment system fiscal year, the hospital specific portion is 25% and the federal portion is 75%. Upon completion of the third prospective payment system fiscal year, the hospital's reimbursement is determined by multiplying the diagnostic related group solely by the federal portion. 42 U.S.C. § 1395ww(d)(1). The percentages for the third year of this "termination period" were revised when Congress extended the transition period to four years as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub.L. 99–272 § 9102).

Provider hospitals' reimbursement under the prospective payment system does not include and could not possibly include any cost experience of providers under the peer review organization system of peer review, because the peer review organization system was not fully implemented until November 15, 1984. The only costs associated with peer review that are factored into the prospective payment system are the costs experienced under the professional standards review organization system of review, and these would include only the indirect costs that providers reported to the fiscal intermediary as part of their administrative and general cost center. The indirect costs incurred by delegated hospitals under the old system did not include any photocopying costs for the purpose of furnishing medical records to the professional standards review organization.

On January 15, 1986, WiPRO implemented a policy of offsite review that required the plaintiffs to copy 100% of the medical records required by WiPRO and to mail or deliver those records to WiPRO's offices. This shift to offsite review represented a

departure from WiPRO's statement in § IV. C. of the memorandum of understanding that it intended to perform most of its reviews onsite. A major factor in WiPRO's decision to implement off-site review was the fact that Health Care Financing Administration audits revealed that errors were occurring which WiPRO staff believed could be reduced by centralizing reviews so that greater supervision and thus greater consistency in the review process would be possible.

On June 30, 1986, the Health Care Financing Administration awarded WiPRO a second two-year contract to perform peer review in Wisconsin. The original memorandum of understanding between WiPRO and plaintiffs expired on June 30, 1986. WiPRO and plaintiffs have agreed to a one sentence interim memorandum of understanding under which WiPRO agrees to perform review services for plaintiffs as required under the Medicare Act and regulations.

## OPINION

■■■■ The plaintiffs in this action seek declaratory and injunctive relief to prevent enforcement of rules promulgated by the defendant Secretary of Health and Human Services. When such "notice-and-comment" rulemaking is challenged, the reviewing court must determine whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *ITT World Communications, Inc. v. F.C.C.*, 725 F.2d 732, 741 (D.C.Cir. 1984). If the agency's construction of a statute that it is charged with administering is contrary to clear legislative intent, the court must reject the agency's interpretation. *Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837, 104 S.Ct.

2778, 2781–82 & n. 9, 81 L.Ed.2d 694 (1984). However, where the statute is silent or ambiguous as to a specific issue, the court will consider whether the agency's interpretation is based on a permissible construction of the statute. *Id.* 104 S.Ct. at 2782; *ITT World Communications*, 725 F.2d at 741.

■■■■ Agency administration of a congressionally-created program " 'necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " *Chevron, U.S.A.*, 104 S.Ct. at 2782, quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974); *Cerro Copper Products Co. v. Ruckelshaus*, 766 F.2d 1060, 1067 (7th Cir.1985).[1] Such agency decisions are entitled to great deference. *Chevron, U.S.A.*, 104 S.Ct. at 2782; *Cerro Copper Products*, 766 F.2d at 1067. The reviewing court must assume that the agency's actions were proper and must refrain from substituting its judgment for that of the agency. *ITT World Communications*, 725 F.2d at 742. Nonetheless, a court's inquiry into whether an agency decision was arbitrary and capricious or an abuse of discretion is not limited to determining whether the agency's action had a rational basis. *Id.* The court must determine also whether the agency's rulemaking was based on a consideration of all relevant factors. *Bowman Transportation v. Arkansas—Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Cerro Copper Products*, 766 F.2d at 1066; *ITT World Communications*, 725 F.2d at 742.

The plaintiffs' first argument is that the photocopy regulation at issue, 42 C.F.R. § 466.78(b)(2), conflicts directly with the plain language of 42 U.S.C.

---

**1.** The Court of Appeals for the District of Columbia has distinguished agency action interpreting a statute, which must be accepted unless inconsistent with clear congressional intent, and agency policy decisions, which are judged according to the arbitrary and capricious or abuse of discretion standard. *ITT World Communications*, 725 F.2d at 741–42. I considered application of this analysis to the facts of the present case, but found the distinction unworkable, at least in the context of this case. Consequently, I have applied the arbitrary, capricious, or abuse of discretion standard to all actions of the Secretary challenged by the plaintiffs. This application appears consistent with the standard of review of agency actions adopted by the Seventh Circuit. *See, e.g., Cerro Copper Products*, 766 F.2d at 1066–67.

§ 1395cc(a)(1)(F). That section provides in relevant part that to be eligible for Medicare payments, a provider hospital must enter into an agreement with a peer review organization for review of the hospital's care and treatment of its Medicare patients. Regarding this agreement with a peer review organization, the statute states:

> ... (and for purposes of payment under this subchapter, the cost of such agreement to the hospital shall be considered a cost incurred by such hospital in providing inpatient services under part A, and (i) shall be paid directly by the Secretary to such organization on behalf of such hospital in accordance with a rate per review established by the Secretary, (ii) shall be transferred from the Federal Hospital Insurance Trust Fund, without regard to amounts appropriated in advance in appropriation Acts, in the same manner as transfers are made for payment for services provided directly to beneficiaries, (iii) shall be not less than an amount which reflects the rates per review established in fiscal year 1982 for both direct and administrative costs (adjusted for inflation), and (iv) shall not be less in the aggregate for a fiscal year than the aggregate amount expended in fiscal year 1982 for direct and administrative costs (adjusted for inflation)) of such reviews.

The plaintiffs contend that the statutory mandate that the Secretary pay directly to the peer review organization those costs of the peer review agreement incurred by hospitals prohibits the Secretary from promulgating a regulatory requirement that hospitals absorb the cost of photocopying medical records necessary for peer review.

At worst, the plaintiffs argue, the statutory language might be intended to require the Secretary to pay only those costs of peer review that are not already reimbursed under the prospective payment system. To some extent, the Secretary agrees with this position. He contends that § 1395cc(a)(1)(F) clearly does not require reimbursement of costs that are included in the prospective payment rates. However, the Secretary also contends that the prospective payment system is the sole mechanism by which photocopy costs may be reimbursed.

Both the plaintiffs and the Secretary cite the legislative history in support of their positions. As passed by the House of Representatives, § 1395cc(a)(1)(F) did not contain a requirement that the Secretary pay costs of peer review incurred by the hospitals. Senator Durenberger, who introduced the Senate amendment to require such payment, explained his reasoning.

> Mr. President, the amendment I offer goes beyond setting out our intent to establish utilization and quality control peer review. Our intent was made clear when Congress adopted the peer review provision contained in TEFRA last year. The amendment goes as far as possible to insure that the TEFRA provision is implemented.
>
> With this amendment, it is possible to fund peer review organization activities without the uncertainty associated with the appropriation process. The costs of peer review, both direct and administrative, are deemed to be costs incurred in providing inpatient services under Part A. While not included in the prospective rates, the Secretary, on behalf of the Hospital, would be required to pay for these costs out of the hospital insurance trust fund. In addition, as a minimum, hospital insurance trust funds would be paid to [peer review organizations] at no less than the rates per review established in fiscal year 1982 for both direct and administrative costs adjusted for inflation.

129 Cong.Rec. S3693 (daily ed. March 23, 1983) (remarks of Sen. Durenberger).

According to the plaintiffs, the Senator's statement that "both direct and administrative" costs of peer review are reimbursable under § 1395cc(a)(1)(F), indicates congressional intent to pay any indirect (i.e., administrative) costs incurred by the hospitals, such as the costs of photocopying. In opposition to the plaintiffs, the Secretary ar-

gues that the Senator's remarks represent Congress' intention that peer review activities not be subject to annual appropriations and that therefore the amendment was meant to ensure that the peer review organizations' indirect administrative costs would be paid from the Medicare Trust Fund. The Secretary contends that the Senator was not referring to the indirect administrative costs incurred by hospitals, since those were already paid from the Medicare Trust fund, not the appropriations process, under the old peer review system.

In essence, the parties present two separate issues. The plaintiffs contend that § 1395cc(a)(1)(F) requires the Secretary to pay all their costs of peer review. Alternatively, they argue that the statute requires reimbursement of any costs they incur that are not included in the prospective payment rates, and that virtually all their photocopy costs are not included in those rates. The Secretary counters that not only does § 1395cc(a)(1)(F) not require reimbursement of costs already paid by the prospective payment system, but that the prospective payment system is the sole source of reimbursement of photocopy costs associated with peer review.

■ Thus, the first issue the parties raise is that of the Secretary's underlying determination that "the cost of such [peer review] agreement to the hospital," 42 U.S.C. § 1395cc(a)(1)(F), does not include those costs that are already reimbursed by the prospective payment system. I cannot find that this interpretation of the statutory term "cost" is arbitrary, capricious, or an abuse of discretion. Nor can I find it not in accordance with law. Rather, I conclude that there is a rational basis for the Secretary's determination that Congress did not intend to pay a second time for those costs already included in the prospective payment rates.

The second issue presented by the parties' arguments is whether the prospective payment system adequately reimburses the hospitals for costs incurred in photocopying medical records or, put another way, whether the prospective payment rates are intended to be the sole reimbursement for photocopy costs associated with peer review. This issue appears to the crux of the parties' dispute.

The plaintiffs contend that the prospective payment rates do not compensate provider hospitals for photocopy costs incurred under the present peer review organization system. The plaintiffs point out that prospective payment rates were established using data from base years when the old professional standards review organization system was operative, and that therefore the only costs factored into the rates were those costs reported under the old system of peer review. Under the professional standards review organizations, most hospitals performed delegated review functions. These delegated hospitals made no photocopies of medical records for peer review purposes.[2] Nondelegated hospitals had their reviews conducted either on or offsite by the professional standards review organization. Those nondelegated hospitals whose reviews were held onsite incurred no photocopy costs for medical records. Only those nondelegated hospitals that had reviews performed offsite incurred indirect costs that included the cost of photocopying some medical records for peer review. According to the plaintiffs, these indirect costs incurred by some nondelegated hospitals are the only costs of photocopying medical records for peer review that are factored into the prospective payment rates. Consequently, the costs of photocopying medical records presently incurred by hospitals that formerly conducted delegated review or had nondelegated review performed onsite are not included in the prospective payment rates.

2. The Secretary notes that under the old system there were photocopy requirements other than medical records, such as sanction reports, denial notices and appeals, and medical care evaluation studies. The plaintiffs contend that actual photocopying under these requirements was minimal, especially in comparison to the photocopy burden hospitals bear under the present system.

In addition, the plaintiffs point out, peer review organizations have been given discretion to conduct reviews on or offsite. The peer review system provides a financial incentive for peer review organizations to conduct reviews offsite, since the organizations save travel and other costs associated with offsite review. At least in Wisconsin, the result has been a shift to offsite review, thereby requiring the hospitals to photocopy and deliver all medical records necessary for the review process. Under this present system of offsite review and greatly increased photocopying, the plaintiffs contend, the photocopy costs reimbursed by the prospective payment rates are but a small fraction of the photocopy costs hospitals actually incur.

The plaintiffs argue that in promulgating the photocopy regulation under these conditions, the Secretary acted arbitrarily and capriciously in that the regulation was not supported by, and in fact was counter to, evidence in the record. In support of this proposition, the plaintiffs contend that the Secretary offered no statistical support for the conclusion that the prospective payment rates adequately reimburse photocopy costs, ignored evidence to the contrary, and refused to conduct a fiscal impact analysis. They claim that the Secretary himself recognized the inadequacy of reimbursement under the prospective payment system by stating in the record: "Costs related to such activities are accounted for, *in some measure,* in the prospective payment base rates." (Emphasis added.)

In addition, the plaintiffs contend that the Secretary's regulation is arbitrary and capricious in that the Secretary failed to consider all relevant factors. Specifically, the plaintiffs argue that the Secretary assumed that the volume of photocopying would not change significantly from the old peer review system, citing statements of the Secretary in the rulemaking record that the peer review organization system would require hospitals to photocopy medical records "in some cases" and may result in a "potential increase" in photocopying costs not specifically part of the prospec-

tive payment rates. The plaintiffs contend that these statements indicate that the Secretary failed to consider a highly relevant factor: the combined impact on the photocopy burden of the discontinuance of delegated review and the shift to primarily offsite review. According to the plaintiffs, this failure to consider the greatly increased photocopy costs associated with the present system renders the Secretary's action in promulgating the photocopy regulation arbitrary and capricious.

The Secretary counters that all photocopy costs incurred by hospitals in connection with peer review are reimbursed through the prospective payment system. He notes first that to the extent hospitals reported photocopy costs as indirect costs under the former system of peer review, those photocopy costs are included in the prospective payment rates. I do not understand the plaintiffs to dispute this contention.

The Secretary raises a number of other arguments to support his contention that photocopy costs are reimbursed adequately by the prospective payment system. First, he notes that under the former system various documents such as sanction reports and denial notices and appeals were photocopied by the hospitals, and that these costs presently are factored into the prospective payment rates. Second, the Secretary contends that because offsite review does not require hospital space, the provider hospitals are saving space costs to offset the additional photocopy burden. Third, the Secretary claims that the actual additional photocopy costs represent minimal amounts, especially when compared to the total Medicare revenues received by the plaintiff hospitals. And fourth, the Secretary cites to a 1986 report by his department's Office of the Inspector General that shows hospitals may be earning significant profits under the prepayment system.

■ Even if I found these arguments persuasive, the plaintiffs correctly point out that they are *post hoc* rationalizations without support in the record. As to the

Secretary's first two claims, he has cited to nothing in the rulemaking record to indicate that these were reasons relied upon at the time the regulation was promulgated. His second two claims could not have been relied upon at that time, since the data could only have been collected after the new system took effect. It is well established that the courts may not accept counsel's *post hoc* rationalizations for agency action. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983). Rather, the validity of an agency decision rests solely on the grounds articulated by the agency. *Securities and Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Motor Vehicle Manufacturers Association,* 463 U.S. at 50, 103 S.Ct. at 2870.

In addition, the Secretary contends that the prospective payment system was intended to be the sole source of Medicare reimbursement to provider hospitals. The Secretary's argument is that Congress adopted the prospective payment system, 42 U.S.C. § 1395ww, to promote efficient delivery of Medicare services, deliberately rejecting the prior inefficient system of reimbursement for actual reasonable costs. Reimbursing hospitals for the actual reasonable costs of their photocopies would be a return to the old inefficient system of individualized, retroactive payments, in clear contradiction to the will of Congress, and thus would conflict with the provisions of § 1395ww.

■ I find it difficult to reconcile with the plain language of § 1395cc(a)(1)(F) the Secretary's argument that reimbursement of hospitals' indirect costs of peer review other than by the prospective payment

rates will conflict with the prospective payment statute. I need not reach that issue, however, because I am unable to find from the rulemaking record that this was a reason invoked by the Secretary at the time the photocopy regulation was proposed. The Secretary now claims that the prospective payment statute mandates that no retroactive, individualized payments be made to Medicare providers,[3] but I have been unable to find a reference in the record that the photocopy regulation was promulgated in whole or in part on this ground.

The basis for the agency action that does appear in the rulemaking record is twofold. First, the Secretary found that "in some measure" photocopy costs were reimbursed by the prospective payment rates. Second, the Secretary reasoned that peer review would prevent unnecessary expenditures by provider hospitals,[4] thus providing a fiscal benefit to compensate for any increased photocopy costs. It is on these grounds articulated by the agency that I must review the rulemaking decision.

■ Reviewing the reasons articulated in the rulemaking record, I conclude that the Secretary failed to consider all relevant factors in reaching the decision. The Secretary's justification rests in large part on an assumption that prospective payment rates would provide more or less adequate reimbursement for the increased photocopy burden. Statements in the record such as "in some cases" peer review will require photocopies from hospitals, "in some measure" photocopy costs are included in prospective payment rates, and "a potential increase" in photocopy costs, convince me that the Secretary assumed that the increased costs of photocopying under the new peer review organization system would be minimal at most. The provider hospitals' increased photocopy costs may be minimal in comparison to their total

---

3. With the exception of exemptions set forth in the prospective payment statute itself, 42 U.S.C. § 1395ww.

4. The example cited in the record is that in many cases preadmission review activities by the peer review organization will protect the hospitals from retrospective denials of Medicare reimbursement.

Medicare reimbursement, but those costs are not minimal in real terms.

It is clear from the rulemaking record that commenters objected to the proposed rules specifically on the ground of the greatly increased photocopy burden that would be placed on providers as a result of discontinuance of delegated review and the shift to offsite review. Thus the Secretary was aware of these factors at the time the rule was under consideration. The record fails to establish that the Secretary considered them in deciding to promulgate the rule. Therefore, I conclude that the agency's action was not based on a consideration of all the relevant factors. The plaintiffs' motion for summary judgment will be granted as to the Secretary and the Secretary's motion for summary judgment will be denied.

The plaintiffs also argue that the photocopy regulation conflicts with 42 U.S.C. § 1395x(v)(1)(A), in that the regulation impermissibly shifts costs attributable solely to Medicare patients onto non-Medicare patients. In light of the conclusion that the photocopy regulation is invalid because of the Secretary's failure to consider all relevant factors, I do not reach the issue of possible conflicts with § 1395x(v)(1)(A).

Finally, defendant WiPRO contends that the plaintiffs have failed to state a claim against it. WiPRO points out that the current memorandum of understanding with the plaintiffs provides only that WiPRO will perform review services for the plaintiffs as required under the Medicare Act and regulations; there is no clause in this current memorandum specifically addressing photocopy costs. WiPRO also claims that if the Secretary is enjoined from enforcing the photocopy regulation and pays WiPRO for the costs of photocopies provided by the hospitals, WiPRO certainly will pass the payments along to the hospitals.

I find that there is no live controversy as to defendant WiPRO. There is no evidence that WiPRO would act in bad faith if the Secretary were enjoined from enforcing the regulation. Furthermore, there presently is no specific contract provision requiring hospitals to pay the costs of photocopying medical records, so an injunction of the photocopy regulation would require no changes to the current memorandum of understanding. Therefore, defendant WiPRO will be dismissed from this action.

### ORDER

IT IS ORDERED that the plaintiffs' motion for summary judgment as to the defendant Secretary of Health and Human Services is GRANTED on the ground that the Secretary failed to consider all relevant factors. The Secretary's motion for summary judgment is DENIED. The Secretary is enjoined from enforcing those provisions of 42 C.F.R. § 466.78(b)(2) which require hospitals to photocopy and deliver to the peer review organization, without charge, all information required for peer review activities.

IT IS ORDERED further that the plaintiffs' action against defendant Wisconsin Peer Review Organization is DISMISSED. The Clerk of Court is directed to enter judgment for the plaintiffs against defendant Bowen and in favor of Wisconsin Peer Review Organization.