**CERRO COPPER PRODUCTS COMPANY and Village of Sauget, Petitioners,**

**v.**

**William D. RUCKELSHAUS, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents.**

Nos. 83–3053, 84–1457.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 13, 1984.

Decided July 1, 1985.

Rehearing Denied Sept. 11, 1985.

Joseph Wright, Jr., Martin, Craig, Chester & Sonnenschein, Chicago, Ill., for petitioners.

Dov Weitman, Atty. Office of Gen. Counsel, U.S. Environmental Protection Agency, for respondents.

Before ESCHBACH and COFFEY, Circuit Judges, and DOYLE, Senior District Judge.[*]

COFFEY, Circuit Judge.

The petitioners, Cerro Copper Products Co. and the Village of Sauget, Illinois, seek review of certain regulations promulgated by the Environmental Protection Agency concerning the pretreatment of wastewater discharge from industrial copper-forming facilities. We deny the petition for review.

I

In 1972 and 1977, Congress amended the Clean Water Act ("Act") in an effort to control water pollution and "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1982). The Act presently provides that direct dischargers—those who expel wastewater directly into navigable waters—must comply with the "best practicable control technology currently available" by July 1, 1977, to limit pollutants within their wastewater discharge, commonly referred to as effluent. 33 U.S.C. § 1311(b)(1)(A). The Act further provides that by July 1, 1984, the direct dischargers must comply with the more stringent standard of "best available technology economically achievable" in regulating effluent pollutants. 33 U.S.C. § 1311(b)(2). In addition, the Act provides that indirect dischargers—those whose wastewater passes through a publicly owned treatment works plant ("POTW")—pretreat their wastewater discharge before passing it along to the POTW for further treatment. Congress directed the Environmental Protection Agency ("EPA") to administer, implement, and enforce the provisions of the Act, and in this capacity, the EPA is to establish "pretreatment standards for introduction of pollutants into

[*] The Honorable James E. Doyle, Senior District Judge for the Western District of Wisconsin, is sitting by designation.

treatment works ... which are publicly owned for those pollutants which are determined not to be susceptible to treatment by such treatment works or which would interfere with the operation of such treatment works." 33 U.S.C. § 1317(b)(1). Congress instructed the EPA to "establish national pretreatment standards for toxic pollutants based on the best available technology economically achievable, or any more stringent effluent standards...." H.R.Conf.Rep. No. 830, 95th Cong., 1st Sess. 87, *reprinted in* 1977 U.S.Code Cong. & Ad.News 4326, 4424, 4462.

The requirement that indirect dischargers remove pollutants from their effluent through pretreatment procedures, before introducing such wastewater into the POTW, creates the potential for unnecessary, duplicative wastewater treatment procedures if the POTW is capable of efficiently removing those same pollutants. Thus, in an effort "to avoid treatment for treatment's sake," *see* Senate Comm. on Environment and Public Works, 95th Cong., 2d Sess., Legislative History of the Clean Water Act of 1977, at 343 (Comm. Print 1978), the Act provides that:

"[i]f, in the case of any toxic pollutant under subsection (a) of this section introduced by a source into a publicly owned treatment works, the treatment by such works removes all or any part of such toxic pollutant and the discharge from such works does not violate that effluent limitation or standard which would be applicable to such toxic pollutant if it were discharged by such source other than through a publicly owned treatment works, and does not prevent sludge use or disposal by such works in accordance with section 1345 of this title, then the pretreatment requirements for the sources actually discharging such toxic pollutant into such publicly owned treatment works may be revised by the owner or operator of such works to reflect the removal of such toxic pollutant by such works."

33 U.S.C. § 1317(b)(1). This statutory removal credit program allows indirect dischargers to modify the pollutant levels within their wastewater discharge based upon the degree of pollution reduction achieved by the POTW. In effect, the indirect dischargers, when pretreating their wastewater, are not required to remove those pollutants that can be efficiently treated and removed by the POTW. The statutory removal credit program ensures that the combination of pretreatment by the indirect discharger and further treatment by the POTW achieves "at least that level of treatment which would be required if the industrial source were making a direct discharge." H.R.Conf.Rep. No. 830, 95th Cong., 1st Sess. 87, *reprinted in* 1977 U.S.Code Cong. & Ad.News 4424, 4462.

In June 1978, the EPA promulgated regulations implementing the general wastewater pretreatment standards for indirect dischargers and setting forth the guidelines to be followed by indirect dischargers and POTWs in qualifying for removal credits. *See* 43 Fed.Reg. 27,736 (1978), amended 46 Fed.Reg. 9404 (1981), codified at 40 C.F.R. §§ 403.1–403.16 (1984). The EPA, in accord with Congressional intent, designed the comprehensive regulations:

"(a) To prevent the introduction of pollutants into POTWs which will interfere with the operation of a POTW, including interference with its use or disposal of municipal sludge; (b) to prevent the introduction of pollutants into POTWs which will pass through the treatment works or otherwise be incompatible with such works; and (c) to improve opportunities to recycle and reclaim municipal and industrial wastewaters and sludges."

40 C.F.R. § 403.2 (1984). The regulations require that pollutants introduced into POTWs by indirect dischargers "shall not Pass Through the POTW or Interfere with the operation or performance of the works." 40 C.F.R. § 403.5(a). The regulations direct POTWs "with a total design flow greater than 5 million gallons per day (mgd) and receiving from Industrial Users pollutants which Pass Through or Interfere with the operation of the POTW ... to establish a POTW Pretreatment Program...." 40 C.F.R. § 403.8(a). The

EPA defines pretreatment as "the reduction of the amount of pollutants, the elimination of pollutants, or the alteration of the nature of pollutant properties in wastewater prior to or in lieu of discharging or otherwise introducing such pollutants into a POTW." 40 C.F.R. § 403.3(q). Thus, the POTW must formulate a pretreatment program to ensure that the pollutant levels within the wastewater discharge of those industrial facilities who use the POTW are in compliance with the EPA standards.

The regulations further provide that the POTW may revise the pretreatment program for an industrial user in order to reflect the POTW's removal of pollutants. To qualify for these "removal credits," the POTW must have an EPA-approved pretreatment program and must submit periodic data to the EPA concerning the quantity and quality of the POTW's normal influent and effluent flow. *See* 40 C.F.R. § 403.7(b), (d). The EPA will approve the revised pretreatment program and grant removal credits only where "the POTW demonstrates Consistent Removal of each pollutant for which the discharge limit in a categorical Pretreatment Standard is to be revised...." 40 C.F.R. § 403.7(b). Indeed, the removal credit will be granted only for the actual removal of the pollutant mass by the POTW, not for a reduction in the concentration of the pollution through dilution of the wastewater. *See* Senate Comm. on Environment and Public Works, 95th Cong., 2d Sess., Legislative History of the Clean Water Act of 1977, at 461 (Comm.Print 1978). *See also* 40 C.F.R. § 403.6(d). If the POTW's pretreatment standards meet with EPA approval and the POTW establishes that it is capable of removing pollutant mass from the wastewater of an indirect discharger, the POTW is authorized to issue revised effluent pollutant limitations for the indirect discharger. This revised discharge limit is calculated through a mathematical formula; dividing

the EPA's pretreatment standard for a given pollutant by the sum of one minus the POTW's consistent removal rate of that pollutant.[1] For example, if the EPA's pretreatment standard is one pound of pollutant discharge for every thousand pounds of mass used in the manufacturing process, and the POTW can remove 75% of that pollutant, then the revised discharge limit for the indirect discharger would be four pounds of pollutant discharge for every thousand pounds of mass used in the manufacturing process. The POTW would remove 75%, or three of the four pounds of the pollutant, thus bringing the wastewater into compliance with the EPA's pretreatment standard of one pound of pollutant for every thousand pounds of discharged mass.

The EPA regulations also provide that each industrial discharger of water pollutants within the United States will be classified within an industrial category. The EPA is to promulgate individual pretreatment standards for each industrial category, specifying the quantity and concentration of pollutants that indirect dischargers may release to their respective POTWs. *See* 40 C.F.R. § 403.6. Realizing that "it may be necessary on a case-by-case basis to adjust the limits in categorical Pretreatment Standards, making them either more or less stringent, as they apply to a certain Industrial User," the EPA included "a fundamentally different factors" ("FDF") variance for each industrial category. 40 C.F.R. § 403.13(b). According to the EPA:

> "[a]ny interested person believing that factors relating to an Industrial User are fundamentally different from the factors considered during development of a categorical Pretreatment Standard applicable to that User and further, that the existence of those factors justifies a different discharge limit than specified in the applicable categorical Pretreatment Stan-

---

1. The removal credit formula is: $y = \dfrac{x}{1-r}$

where:

x = The discharge limit of a pollutant according to the EPA's pretreatment standards.
r = The POTW's consistent removal rate for that pollutant.
y = The revised discharge limit.

dard, may request a fundamentally different factors variance under this section or such a variance request may be initiated by the EPA."

*Id.* The factors to be considered in determining whether to grant a FDF variance include, *inter alia,* the nature and quality of the pollutant; the volume of wastewater discharge; the environmental impact; the energy requirements; the age, size, and land availability of the industrial facility; and the cost of compliance with control technology. *See* 40 C.F.R. § 403.13(d). The factors that are expressly *not* to be considered in granting a FDF variance include, *inter alia,* the feasibility of installing pretreatment equipment; the inability to pay for the waste treatment; and the impact of the discharge upon the quality of the POTW's receiving waters. *See* 40 C.F.R. § 403.13(e). In addition, the indirect discharger, in order to obtain a FDF variance, must show that the cost of implementing the EPA's pretreatment standard is "wholly out of proportion" with the removal cost projected by the EPA or, in the alternative, that the impact upon the environment would be "fundamentally more adverse" than the impact projected by the EPA. 40 C.F.R. § 403.13(c)(2)(iv).

On August 15, 1983, the EPA issued the pretreatment standards and effluent limitations for the direct and indirect dischargers within the copper-forming industry. According to the EPA, "[t]he Agency considered a number of factors to determine whether subcategorization is needed in the copper forming category. After consideration of these factors, the Agency has determined that the copper forming category is most appropriately regulated as a single subcategory." 48 Fed.Reg. 36,944 (1983). The EPA based this conclusion upon the fact that the 176 copper-forming facilities within the United States perform five basic operations—hot rolling, cold rolling, extrusion, drawing, and forging—that utilize water, oil-water emulsions, or soluble oil-water mixtures as lubricants that are included within the wastewater discharge. The EPA's thorough and exhaustive study of the copper-forming industry revealed that:

"[p]ollutants found in significant amounts in copper forming waste streams include: chromium, copper, lead, nickel and zinc; toxic organics; and suspended solids, pH, and oil and grease. In addition, the sludges generated by treatment of these wastewaters usually contain large quantities of toxic metals.

There are 176 facilities in the copper forming category; these facilities employ a total of 43,000 people. Total production capacity is approximately 3.5 million kkg/yr. Within the category, 37 facilities discharge to navigable wastewaters, 45 facilities discharge to POTW's and 94 plants do not discharge wastewater."

*Id.* at 36,945. The EPA found that in the copper-forming industry, the POTWs were ineffective in treating the toxic pollutants—including chromium, copper, lead, nickel, zinc, and toxic organics [2]—present in the wastewater of copper-forming facilities. According to the EPA:

"[i]n the copper forming category, the Agency has concluded that the toxic metals regulated under these standards (chromium, copper, lead, nickel, and zinc) pass through the POTW. The nationwide average percentage of these same toxic metals removed by a well-operated POTW meeting secondary treatment requirements is about 50 percent (ranging from 20 to 70 percent), whereas the percentage that can be removed by a copper forming direct discharger applying the best available technology economically achievable is about 90 percent. Accordingly, these pollutants pass through a POTW."

*Id.* at 36,947. Thus, the EPA issued pretreatment regulations requiring, *inter alia,*

---

*See* 40 C.F.R. § 403.7(d)(4).

**2.** The toxic organic pollutants generally found in the wastewater of a copper-forming facility include benzene; 1, 1, 1-trichloroethane;' chloroform; 2, 6-dinitrotoluene; ethylbenzene; me-thylene chloride; napthalene; N-nitrosodiphenylamine; anthracene; phenanthrene; toluene; and trichloroethylene. *See* 40 C.F.R. § 468.-02(r).

flow reduction techniques and "end-of-pipe" pre-discharge treatment in the form of "[c]hemical reduction of chromium; chemical precipitation of metal ions using hydroxides or carbonates; removal of precipitated metals by settling; pH control; oil skimming; chemical emulsion breaking; and filtration." *Id.* at 36,945. In effect, the EPA regulations placed numerical limitations upon the toxic pollutant mass that could be discharged from copper-forming facilities. The EPA concluded that these pretreatment regulations "will not result in any closures [or] job losses" for the forty-five indirect dischargers within the copper-forming industry. *Id.* at 36,949. The EPA added, of course, that these pretreatment standards for the copper-forming industry were "subject to the 'fundamentally different factors' variance and credits for pollutants removed by POTW." *Id.* at 36,955. In compliance with section 307(b)(1) of the Clean Water Act, 33 U.S.C. § 1317(b)(1), the EPA required indirect dischargers in the copper-forming industry to comply with the pretreatment standards within three years of their promulgation. Thus, the forty-five indirect dischargers in the copper-forming industry must have wastewater pretreatment programs that comply with the "best available technology economically achievable" in operation by August 15, 1986. *See* 40 C.F.R. § 468.04.

In September 1983, the Third Circuit ruled in *National Ass'n of Metal Finishers v. EPA,* 719 F.2d 624 (3d Cir.1983), ("*Metal Finishers*"), that "FDF variances for toxic pollutant discharges are forbidden by the [Clean Water] Act." 719 F.2d at 646. In response, the EPA withdrew the FDF variance provision from its regulations in February 1984. *See* 49 Fed.Reg. 5131 (1984), codified at 40 C.F.R. § 403.13(b)(2). Recently, the Supreme Court, in *Chemical Mfrs. Ass'n v. Natural Res. Defense Coun.,* — U.S. ——, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) ("*Chemical Manufacturers*"), overturned the Third Circuit's ruling and held that "it is thus important that EPA's nationally binding categorical pretreatment standards for indirect dischargers be tempered with the flexibility that the FDF variance mechanism offers, a mechanism repugnant to neither the goals nor the operation of the [Clean Water] Act." 105 S.Ct. at 1112. Thus, in line with the Supreme Court's holding in *Chemical Manufacturers,* the EPA may continue, if it so chooses, to permit indirect dischargers of toxic pollutants to obtain FDF variances from their categorical pretreatment standards.[3] In addition, the EPA may continue to grant removal credits to indirect dischargers that pass their wastewater along to a POTW capable of treating and removing a percentage of the industrial user's toxic pollutants.

Turning to the facts in the present case, the record reveals that the petitioner, Cerro Copper Products Co., ("Cerro") is a copper-forming facility located in Sauget, Illinois, that manufacturers seamless copper tubing for plumbing, industrial, and refrigeration uses. The EPA classifies Cerro as an indirect discharger of toxic organic pollutants as well as the toxic metal pollutants of chromium, copper, lead, nickel, and zinc. The co-petitioner, Village of Sauget, Illinois, owns and operates the Sauget POTW, which treats the wastewater discharge of Cerro and various other industries within Sauget and the surrounding area. The Sauget POTW was built in the early 1970's after a study by the local industries revealed that the most cost-effective treatment of industrial wastewater would be through the construction and operation of a centrally located POTW. The record reveals that the local industries within the Sauget area contributed $7,870,000 to the $8,670,000 construction cost of the POTW, while the Village of Sauget and the Federal

---

3. Following the Supreme Court's decision in *Chemical Manufacturers,* approving the EPA's FDF variance program for dischargers of toxic pollutants, the parties in this case submitted supplemental briefs discussing the effect of the Court's decision upon their respective positions before this court. The EPA informed the court that it "plans to reinstate soon the regulatory provision that provided, for all categorical pretreatment standards, an FDF variance procedure for toxic pollutants."

Government funded the remainder of the costs.[4] According to the EPA, the Sauget POTW is not presently in compliance with the EPA's regulations concerning effluent pollutant limitations for "secondary treatment" POTWs. *See* 33 U.S.C. § 1311(b)(1)(B). Moreover, the EPA claims that the Sauget POTW's removal of toxic pollutants discharged by Cerro is not at the level of "best available control technology economically achievable" as required by the EPA regulations.

The petitioners respond that construction of a regional wastewater treatment plant to serve southwestern Illinois is in progress and upon completion in 1986, the regional plant will treat Cerro's wastewater discharge to the degree necessary to comply with the EPA standards. The costs for this regional POTW are being funded in large measure (85%) through Federal Government monies, with the remaining funds being secured through the issuance of revenue bonds guaranteed by the local industries of Sauget, including Cerro. This regional POTW, when completed, will treat sewage from cities and municipalities in southwestern Illinois as well as industrial wastewater that has already passed through the Sauget POTW. The petitioners argue that in view of the local Sauget POTW, and soon to be completed regional pollution control system in southwestern Illinois, they present a unique situation that merits special consideration by the EPA. According to the petitioners, the Sauget POTW is a reasonable alternative to installing pretreatment equipment at Cerro's manufacturing plant because the Sauget POTW will pretreat the wastewater discharge before passing it along to the soon to be completed regional POTW. The petitioners, in effect, argue that Cerro's pretreatment of its wastewater discharge will be unnecessary and wasteful once the regional treatment facility is completed and in full operation in the immediate future. The petitioners claim that the EPA failed to take these unique circumstances into ac-

count when it formulated uniform, national pretreatment standards for the copper-forming industry. The petitioners further contend that the EPA regulations implementing the removal credits program are invalid because they do not address the unique situation presented in this case where the Sauget POTW, and the soon to be completed regional POTW, will successfully remove the toxic pollutants discharged by Cerro.

## II

 This court has jurisdiction to review the regulations promulgated by the EPA for the pretreatment of wastewater discharge from industrial copper-forming facilities pursuant to 33 U.S.C. § 1369(b)(1) which provides, in pertinent part, that:

> "[r]eview of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, ... (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, ... (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1315 of this title ... may be had ... in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person."

*See also E.I. DuPont De Nemours & Co. v. Train,* 430 U.S. 112, 136–37, 97 S.Ct. 965, 979–80, 51 L.Ed.2d 204 (1977). We add that in reviewing the regulations promulgated by the EPA, we must uphold the Agency's "action, findings, and conclusions" unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). Our role is to determine whether the Agency's decision " 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Bowman Transp. v.*

---

**4.** The record reveals that the Village of Sauget contributed $800,000 to the construction of the Sauget POTW and that the Federal Government contributed $264,300 as reimbursement to Sauget for engineering fees.

*Ark.-Best Freight System,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). *See also Amer. Meat Institute v. EPA,* 526 F.2d 442, 453 (7th Cir.1975). Moreover, the Supreme Court has repeatedly recognized that the " 'power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " *Chevron, U.S.A., Inc. v. Natural Resources Defense,* —— U.S. ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)). Thus, we are to accord great deference to "an executive department's construction of a statutory scheme it is entrusted to administer...." *Chevron, U.S.A., Inc. v. Natural Resources Defense,* 104 S.Ct. at 2782. *See also EPA v. National Crushed Stone Assn.,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980); *Mobil Oil Corp. v. EPA,* 716 F.2d 1187, 1189 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). We further realize that Congress, in enacting the Clean Water Act, gave the Administrator of the EPA "broad discretion to choose the means by which he will carry out his responsibilities." *Inland Steel Co. v. EPA,* 574 F.2d 367, 373 (7th Cir.1978).

The basic issue before this court is whether the EPA, in promulgating national wastewater pretreatment standards for facilities within the copper-forming industry, failed to adequately account for the petitioners' alleged unique situation. The petitioners argue that Cerro's wastewater discharge is presently treated at the Sauget POTW and that in the near future the effluent flowing from the Sauget POTW will be treated at the soon to be completed regional POTW. The petitioners claim that following completion of the regional POTW, the wastewater discharged from that facility will satisfy the "best available control technology economically achieva-ble," as required by the EPA. According to the petitioners, once the regional POTW is completed, the Sauget POTW will become a pretreatment facility and the regional POTW will become the POTW, within the meaning of the Clean Water Act. The petitioners contend that in view of the present stage of development and the contemplated completion date of the regional treatment plant, there is no need for Cerro to install additional pretreatment equipment at its manufacturing plant. The petitioners claim that the EPA failed to consider this alleged unique situation when it promulgated uniform, national wastewater pretreatment standards for the copper-forming industry. We believe it important to note that the petitioners presented this very same argument to the EPA in 1981, claiming that their situation differed substantially from that of the average copper-forming facility and thus Cerro should not be subject to the uniform, national regulations for the copper-forming industry. The EPA responded that, "the standards being promulgated establish national pretreatment standards. Issues relating to individual POTWs are not addressed by this rulemaking." The petitioners, not satisfied with the EPA's response to their claim, now raise their "unique situation" argument before this court.

We summarily dispose of the petitioners' attack upon the EPA's uniform, national pretreatment standards for the copper-forming industry as the legislative history of the Clean Water Act clearly reveals that Congress intended the EPA to promulgate wastewater pretreatment standards on a nationwide basis. The House Report provides that:

"[i]t should be understood that the pretreatment standards established under this section would be *national in scope* and addressed to the most significant pretreatment problems. The Committee expects that the standards would vary with the broad type of treatment processes used, but *the Committee does not intend that each individual treatment works would have its pretreatment*

*standards set up by the Administrator."*

H.R.Rep. No. 911, 92d Cong., 2d Sess. 113 (1972), *reprinted in* Senate Comm. on Public Works, 93d Cong., 1st Sess., Legislative History of the Water Pollution Control Act Amendments of 1972, at 800 (Comm.Print 1973) (emphasis added). Thus, Congress expressly intended that the EPA, when establishing national wastewater pretreatment standards for the various industrial categories, not take into account the individual characteristics of each industrial facility and POTW. Congress realized that due to the many variables existing throughout the wide range of industries, it would be impossible for the uniform, national pretreatment standards to accommodate each and every facility within an industrial category. According to the Senate Report:

"[a]nother reason for minimizing the consideration of removals in the development of national pretreatment standards is that the performance of treatment works on industrial waste, except in those few cases where the system is specifically designed to treat a certain type of industrial waste, is extremely variable. Data that have [sic] been presented to this committee indicate that secondary treatment removal efficiency for metals varies from between 10 and 70 percent. Variability of such magnitude makes the assumption of specific level of removal, when setting national standards, almost impossible."

S.Rep. No. 370, 95th Cong., 1st Sess. 58, *reprinted in* 1977 U.S.Code Cong. & Ad. News 4326, 4383. In view of the variety of industrial facilities and POTWs subject to the uniform, national pretreatment standards, Congress enacted the removal credit program to allow indirect dischargers to modify the pollutant levels within their wastewater discharge based upon the degree of pollution reduction achieved by the POTW. The House Conference Report provides that:

"in applying these pretreatment standards through its pretreatment program, the owner or operator of the municipal treatment works could modify the requirements applicable to individual classes of sources introducing that pollutant into the treatment works to reflect the degree of reduction of that pollutant achieved by the treatment works."

H.R.Conf.Rep. No. 830, 95th Cong., 1st Sess. 87, *reprinted in* 1977 U.S.Code Cong. & Ad.News 4424, 4462. Accordingly, the legislative history of the Clean Water Act reveals that Congress intended the EPA to promulgate uniform, national wastewater pretreatment standards and then permit modification of these standards through the removal credits program.

■ In the present case, the EPA conducted a thorough and exhaustive study of the copper-forming industry. *See* 48 Fed. Reg. 36,942–67. The EPA solicited information from all 176 facilities within the industry concerning the copper-forming processes used; the mass pollutant content of the wastewater discharge; the size, age, and land availability of the facility; and the existing pollution treatment devices in use. Based upon this industry-wide study, the EPA found that the wastewater discharge of all facilities within the copper-forming industry contained toxic organic pollutants as well as toxic metal pollutants, including chromium, copper, lead, nickel, and zinc. The EPA found that the average POTW was unable to remove these toxic pollutants from the wastewater at the required level of "best available control technology economically achievable." Thus, the EPA promulgated uniform, national pretreatment standards, requiring copper-forming facilities to use pretreatment procedures to remove toxic pollutants from their wastewater before passing such water along to the POTW. In view of Congress' mandate to promulgate uniform, national pretreatment standards and the EPA's exhaustive review of the copper-forming industry, we uphold the EPA's wastewater pretreatment regulations for the copper-forming industry as a fair, reasonable, and proper embodiment of clear Congressional intent.

■ The petitioners further claim that the EPA's removal credit program is invalid because its application requires Cerro to pretreat its wastewater discharge before passing it along to the Sauget POTW. The petitioners argue that Cerro's pretreatment amounts to nothing more than "treatment for treatment's sake" because the Sauget POTW and the soon to be completed regional POTW are capable of removing pollutants to satisfy the EPA's pollutant discharge limitations. The Clean Water Act provides that the Federal Court of Appeals may review the EPA regulations implementing the removal credit program only if the petitioner filed a petition "within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day." 33 U.S.C. § 1369(b)(1). In the present case, the EPA regulations for the removal credit program were promulgated and available to the public in January 1981, but the petitioners failed to challenge the regulations until November 1983, when they filed a petition for review before this court. The petitioners concede that their failure to satisfy the ninety day filing requirement bars a challenge of the removal credit program at this late date. Nevertheless, the petitioners argue that their challenge lies against the pollutant limitations that result from *application* of the removal credit formula, not against the removal credit formula itself. Despite the petitioners' assertion to the contrary, we are unable to discern any difference between a challenge to the removal credit formula and a challenge to the application of that very same formula. Indeed, the EPA's sole purpose in implementing the removal credit formula was to *apply* the formula on a case by case basis. The petitioners failed to challenge the removal credit formula within the ninety day statutory period, and we believe that it contravenes the principles of fairness and equity to permit the petitioners to circumvent this limitation, some three years later, by attempting a collateral challenge upon the very same removal credit formula. Accordingly, we are without jurisdiction to address the petitioners' claim concerning the validity of the EPA's removal credit program when applied to the copper-forming industry. *See, e.g., Granite City Steel Co. v. EPA,* 501 F.2d 925, 926 (7th Cir. 1974).

■ We do note that the EPA's removal credit program is an integral component of the Clean Water Act and is vital to the EPA's implementation of the Act. The removal credit program, enacted by Congress and administered by the EPA, allows industrial facilities to modify the pollutant levels within their wastewater discharge based upon the degree of pollution reduction achieved by the POTW. Thus, in reviewing the uniform, national pretreatment standards promulgated by the EPA for the copper-forming industry, we must also examine the removal credits program which permits qualifying POTWs and indirect dischargers to revise the EPA pretreatment standards. The EPA's removal credit regulation consists of a forula that permits indirect dischargers to receive credit for the POTW's removal of pollutants. *See* 40 C.F.R. § 403.7(d)(4).[5] The POTW must actually remove the pollutant mass from the wastewater and removal credits are not to be granted for simple dilution, i.e., increasing the volume of water and thereby decreasing the number of pollutants per unit of water. Congress, in enacting the Clean Water Act, intended above all to remove pollutants from the Nation's waters, not to dilute the pollutants by introducing them into larger bodies of water. According to the House Report, "[i]n promulgating national pretreatment standards the Administrator shall include a provision recognizing the option of [a POTW] to modify the requirements to reflect the degree of *reduction* achieved by the treatment works." H.R.Conf.Rep. No. 830, 95th Cong., 1st

---

**5.** *See supra,* footnote 1 for an explanation of the removal credit formula promulgated by the EPA.

Sess. 88, *reprinted in* 1977 U.S.Code Cong. & Ad.News 4424, 4463 (emphasis added). The removal credit program promulgated by the EPA allows indirect dischargers to modify the pollutant levels of their wastewater discharge if the POTW properly removes toxic pollutants from the wastewater within the guidelines specified by the EPA. The EPA's removal credit program effectuates Congressional intent to remove pollutants from our Nation's waters and thus we hold that the program is a proper implementation of the Clean Water Act. *See, e.g., Metal Finishers*, 719 F.2d at 646–650, *rev'd on other grounds*, —— U.S. ——, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985).

■ We address the petitioners' final claim that the EPA improperly withdrew the FDF variance for toxic pollutants. It is important to note that at the time this case was briefed and orally argued, the EPA had withdrawn the FDF variance for toxic pollutants in view of the Third Circuit's holding in *Metal Finishers*, that "FDF variances for toxic pollutant discharges are forbidden by the Act." 719 F.2d at 646. The effect of the Third Circuit's ruling and the EPA's withdrawal of the variance regulation was to remove FDF variances entirely for copper-forming facilities as all of their wastewater pollutants are toxic. The petitioners claim that the Third Circuit's opinion and the EPA's decision to withdraw the FDF variance regulation for toxic pollutants, *see* 49 Fed.Reg. 5131, were in error. Recently, the United States Supreme Court, in *Chemical Manufacturers*, reversed the Third Circuit opinion and held that the FDF variance for toxic pollutants is consistent with Congressional intent in enacting the Clean Water Act. Specifically, the Supreme Court held that the EPA's FDF variance regulation "fairly understood, is not inconsistent with the language, goals, or operation of the Act. Nor does the administration of EPA's [FDF variance] regulation undermine the will of Congress." *Chemical Manufacturers*, 105 S.Ct. at 1112. In so holding, the Court emphasized the importance of FDF variances to the regulatory scheme of the Clean Water Act.

> "The nature of FDF variances has been spelled out both by this Court and by the Agency itself. The regulation explains that its purpose is to remedy categories which were not accurately drawn because information was either not available to or not considered by the Administrator in setting the original categories and limitations. 40 C.F.R. § 403.13(b). An FDF variance does not excuse compliance with a correct requirement, but instead represents an acknowledgement that not all relevant factors were taken sufficiently into account in framing that requirement originally, and that those relevant factors, properly considered, would have justified—indeed, required— the creation of a subcategory for the discharger in question."

*Id.* at 1110. As a result of the Supreme Court's reversal of the Third Circuit's opinion in *Metal Finishers*, the EPA may grant FDF variances for toxic pollutants. In a supplemental brief filed with this court, the EPA stated that in view of the Supreme Court's decision in *Chemical Manufacturers*, it "plans to reinstate soon the regulatory provision that provided, for all categorical pretreatment standards, an FDF variance procedure for toxic pollutants." It is thus obvious that at the time the EPA reinstates the FDF variance provision for toxic pollutants, the petitioners will have an opportunity to present their claim of alleged unique circumstances to the EPA in an attempt to satisfy the requirements of 40 C.F.R. § 403.13 and obtain a FDF variance. In the meantime, the petitioners must comply with the EPA's pretreatment standards for the copper-forming industry by August 15, 1986. *See* 40 C.F.R. § 468.-04.

### III

We deny the petition for review.[6]

___

6. On October 26, 1984, the EPA filed a motion to strike "extra-record allegations of fact" from the

petitioners' brief. Upon a review of the entire

record, and in view of our disposition of this case, we deny the EPA's motion to strike.