65 F.3d 1472
 49 Soc.Sec.Rep.Ser. 11, Medicare & Medicaid Guide P
43,710,
95 Cal. Daily Op. Serv. 7253,
95 Daily Journal D.A.R. 12,370
QUEEN OF ANGELS/HOLLYWOOD PRESBYTERIAN MEDICAL CENTER;
Swedish Hospital Corporation, dba Swedish Hospital
Medical Center; Saint Mary's Regional
Medical Center, Plaintiffs-Appellants,
v.
Donna E. SHALALA,* Secretary of Health &
Human Services, Defendant-Appellee.
 No. 94-55561.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1995.
Decided Sept. 14, 1995.
 
 Robert A. Klein, Weissburg and Aronson, Los Angeles, CA, for plaintiffs-appellants.
 Gerard Keating, Department of Health & Human Services, Office of the General Counsel, Washington, DC, for defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before: LAY,** BRUNETTI and RYMER, Circuit Judges.
 LAY, Circuit Judge:
 
 
 1
 Queen of Angels/Hollywood Presbyterian Medical Center brought this class action on behalf of all hospitals ("the Hospitals") that have participated in the Medicare program (a health insurance program for the aged and disabled) since July 1, 1991, against the Secretary of Health and Human Services ("the Secretary"). The Hospitals challenge the Secretary's interpretation of 42 U.S.C. Sec. 1395cc(a)(1)(F)(i) relating to costs incurred during reviews by peer review organizations ("PROs"). The Hospitals claim that the Secretary refuses to comply with the statute and that her rule regarding payments to hospitals for costs incurred in duplicating medical records ("the Photocopy Rule") is inconsistent with the statute and therefore invalid. The district court granted summary judgment in favor of the Secretary, concluding her interpretation of the statute and the regulation is reasonable. The Hospitals now appeal.
 
 BACKGROUND
 
 2
 In 1982, Congress enacted the Peer Review Improvement Act (with additional amendments in 1983); the Peer Review Organization ("PRO") system became operational in 1984. PROs are private medical review entities under contract with the Secretary that determine whether services provided by participating hospitals are medically necessary, conform to professional standards of care, and are delivered in the most efficient manner. Under 42 U.S.C. Sec. 1395cc(a)(1)(F)(i), each hospital must, as a condition of Medicare program participation, maintain an agreement with a PRO providing for the PRO's review of services furnished by the hospital. The Secretary's regulations require each hospital to furnish the PRO with copies of patient care and other pertinent data and make facility space available during a PRO review. 42 C.F.R. Sec. 466.78(b).
 
 
 3
 The parties dispute whether the administrative costs incurred by hospitals in complying with peer review requirements are reimbursed under Medicare's Prospective Payment System ("PPS").[1] The Hospitals contend these costs are not reimbursed through the PPS because the PRO system was not established in 1981, when the base reimbursement rates were established.[2] The Secretary argues these PRO compliance costs are reimbursed through the PPS because they are the same as the indirect costs under the earlier PSRO system, which were included as part of the 1981 base year calculus.[3]
 
 
 4
 Partly as a result of this dispute, the parties have differing interpretations of 42 U.S.C. Sec. 1395cc(a)(1)(F)(i) ("the PRO Payment Rule"), which authorizes reimbursements for the cost of PRO agreements. In a parenthetical, this section addresses these reimbursements as follows:
 
 
 5
 [F]or purposes of payment under this subchapter, the cost of such agreement to the hospital shall be considered a cost incurred by such hospital in providing inpatient services under part A of this subchapter, and (I) shall be paid directly by the Secretary to such organization on behalf of such hospital in accordance with a rate per review established by the Secretary, (II) shall be transferred from the Federal Hospital Insurance Trust Fund, without regard to amounts appropriated in advance in appropriation Acts, in the same manner as transfers are made for payment for services provided directly to beneficiaries, and (III) shall not be less in the aggregate for a fiscal year than the aggregate amount expended in fiscal year 1988 for direct and administrative costs....
 
 
 6
 The Hospitals contend this provision clearly provides for reimbursements to the hospitals, through the PRO as fiscal intermediary. The Secretary, on the contrary, has interpreted this provision as providing reimbursements for the PROs, not hospitals, in lieu of hospital payments to the PROs for the cost of specific peer review services.[4] Moreover, the Hospitals allege the PROs are reimbursed for their costs under 42 U.S.C. Sec. 1320c-8, which the Secretary outright rejects.
 
 
 7
 The Hospitals filed their original complaint on March 25, 1992, alleging that since July 1, 1991, the Secretary has failed to adequately reimburse them for their costs in maintaining agreements with the PROs.[5] They alleged that the Secretary misinterpreted the PRO Payment Rule, which they claim requires the Secretary to reimburse hospitals for costs incurred under their PRO agreements by paying a "rate per review" to the Hospitals (through the PROs).
 
 
 8
 On October 20, 1992, the Secretary issued the Photocopy Rule, 57 Fed.Reg. 47,779-87, now codified at 42 C.F.R. Sec. 466.78(c), authorizing an additional payment for hospitals subject to the PPS for PRO-related photocopying costs at a national rate, currently set at $0.07 per page.[6] On June 15, 1992, the Secretary filed the first of two motions to dismiss for lack of subject matter jurisdiction and a justiciable controversy, which the district court subsequently denied. Thereafter, the Hospitals supplemented their original complaint, alleging the Photocopy Rule is invalid under the Administrative Procedure Act and contrary to the "rate per review" provision contained in the PRO Payment Rule. Moreover, they claimed the regulation fails to take into account the other costs incurred by the Hospitals under their agreements with the PROs.[7]
 
 
 9
 After denying the Secretary's second motion to dismiss for lack of jurisdiction, the district court denied the Hospitals' motion for summary judgment while granting the Secretary's. The court upheld as reasonable the Secretary's interpretation of Sec. 1395cc(a)(1)(F)(i) and upheld the validity of the Photocopy Rule, concluding it is neither arbitrary and capricious nor procedurally defective.
 
 
 10
 The Hospitals filed a timely notice of appeal. They urge that the district court erred in upholding the Secretary's construction of the PRO Payment Rule. They also argue that if the PRO Payment Rule requires payment to the Hospitals on a rate per review basis, the Photocopy Rule is clearly invalid. Alternatively, they contend for the first time on appeal that if the Secretary's interpretation is correct, and the statute does not require payment to the Hospitals, the district court lacked jurisdiction to review the validity of the Photocopy Rule, because, under 42 U.S.C. Sec. 1395oo, a hospital dissatisfied with its photocopy reimbursement must first appeal to the Provider Reimbursement Review Board ("the PRRB"). The Hospitals have not appealed the district court's judgment that the Photocopy Rule is neither arbitrary and capricious nor procedurally defective.
 
 DISCUSSION
 I.
 A. The Statute
 
 11
 The Hospitals first contend 42 U.S.C. Sec. 1395cc(a)(1)(F)(i) imposes a clear and unambiguous duty on the Secretary to pay the hospitals their PRO review costs on a rate per review basis. They also claim the Secretary's interpretation of the statute renders meaningless whole portions of the statute. They argue the Secretary's construction reads out of the statute "the cost of such agreement to the hospital," "cost incurred by such hospital," and "on behalf of such hospital": words that indicate the costs at issue are those incurred by hospitals and plainly mandate that the Secretary pay these costs for the benefit of the hospitals.[8]
 
 
 12
 The Secretary responds that the "on behalf of such hospital" language clearly reflects Congress's intent that the Medicare program pay the PROs for the hospitals, obviating any need for the PROs to seek payment from the hospitals. Moreover, the Secretary argues subclauses (II) and (III) would be rendered superfluous by the Hospitals' reading because all hospital inpatient services are already reimbursed through the Medicare Part A Trust Fund, rather than though separate yearly appropriations. Finally, she contends the PRO Payment Rule parallels Sec. 1395cc(a)(3)(B) and (C), which establish a separate but similar PRO funding mechanism for different review functions.[9]
 
 
 13
 We find the Secretary's interpretation of the statute is the correct one. In statutory interpretation, the starting point is always "the language [of the statute] itself." United States v. James, 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). If the plain meaning of the statute is clear, this Court and the agency "must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). We find the language of the PRO Payment Rule clearly supports the Secretary's construction. First, the most natural reading of the introductory clause and subpart (I) of Sec. 1395cc(a)(1)(F)(i) is that the Secretary must reimburse the PROs for their expenses, in lieu of hospital payments to them. This is particularly true in light of the fact that the statute makes no mention of a subsequent payment to be made to the hospitals. Moreover, as the Secretary indicates, subpart (II) of the statute would be rendered superfluous under the Hospitals' construction because hospitals have always been reimbursed from the Medicare Trust Fund and never have received payments from the "appropriation Acts."[10] On the other hand, under the old system, PSROs were reimbursed for their indirect peer review costs through yearly appropriations. Thus, the plain language of the entire PRO Payment Rule clearly (and only) supports the Secretary's interpretation.
 
 
 14
 Even if we assume arguendo that the statute is ambiguous, we find the Secretary must nevertheless prevail. Assuming the statute is ambiguous, and because the Secretary has been entrusted by Congress to administer the Medicare program,[11] our only task is to determine "whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. We need not conclude that the agency's answer is the only reasonable one, or even the "best" one. Id. at 843 n. 11, 104 S.Ct. at 2782 n. 11. At minimum, we conclude the Secretary's interpretation is a reasonable construction of the plain language of the PRO Payment Rule. Moreover, there is nothing found elsewhere in the statutory scheme that rules out this interpretation. Thus, absent some other showing by the Hospitals that the Secretary's interpretation clearly defies Congress's intended purpose for the PRO Payment Rule, the Secretary's reading must be accorded deference. See id. at 844, 104 S.Ct. at 2782 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").
 
 
 15
 The Hospitals additionally argue, however, that the statute's legislative history demonstrates their interpretation furthers Congress's intent, while the Secretary's construction does not. They point to a House Conference Report that stated PRO reviews "would be covered as a hospital cost of care" and the PROs paid on behalf of the hospitals. See H.R.Rep. No. 47, 98th Cong. 1st Sess. 2, reprinted in 1983 U.S.C.C.A.N. 404, 486 [hereinafter "House Report"]. They also assert that Senator Durenberger--who introduced the PRO payment rule--implicitly confirmed Sec. 1395(a)(1)(F)(i) was intended to reimburse hospitals by stating that although these costs would not be included in prospective rate (PPS) payments to the hospitals, the Secretary would have to pay for review costs. See 129 Cong. Rec. 6859 (1983).
 
 
 16
 These arguments are unconvincing, however. Neither the committee statements nor Senator Durenberger's discussion explicitly addresses the intended recipient of the cost reimbursement. See House Report at 486-87; 129 Cong. Rec. 6859. In addition, both passages can also be interpreted as supporting the Secretary's claim that Congress intended to directly reimburse the PROs, which would benefit the hospitals by obviating the need for them to pay for the PROs' review costs.[12] In fact, as the Secretary points out, Senator Durenberger's comments, taken as a whole, suggest that the PRO Payment Rule was simply devised to establish a funding mechanism for PROs that avoids the appropriations process. See 129 Cong. Rec. 6859.[13] Thus, the Hospitals have pointed to nothing in the legislative history surrounding the initial adoption of the PRO Payment Rule in 1983 that casts doubt on the Secretary's interpretation.
 
 
 17
 Finally, the Hospitals contend the Secretary's interpretation has left them without compensation for costs incurred in assisting PROs, except for costs covered by the Photocopy Rule. They argue that although the Secretary has traditionally maintained PRO-related costs are paid to hospitals through the PPS rates, in fact, these costs are not factored into the PPS rates because the PRO program did not begin to operate until three years after the 1981 base rates were established. In addition, under the PSRO system, which preceded PRO review, hospitals were reimbursed outside the PPS mechanism for their direct costs of PSRO review. The Hospitals insist this is why Congress adopted the PRO Payment Rule and why the Secretary's current interpretation of that rule is inconsistent with congressional intent. Moreover, they contend Congress provided for PROs to be paid from the Medicare Trust Fund pursuant to 42 U.S.C. Sec. 1320c-8.[14] They argue the Secretary's reading of Sec. 1395cc(a)(1)(F)(i) therefore renders this other provision superfluous or suggests the two different sections provide for different types of PRO costs, a reading which is wholly unsupported by the statutory scheme.
 
 
 18
 Again, however, the Secretary provides a reasonable, and in fact a more logical explanation of the purpose and intended function of the PRO rule, in light of the relationship between the PRO and PSRO programs, and the PPS funding mechanism.[15] Under the PSRO program, only the "direct costs" incurred by delegated review hospitals and PSROs (undertaking nondelegated reviews) were paid under Medicare but outside of the usual cost-reporting process. See, e.g., 42 C.F.R. Sec. 466.62(a) (1982); see also Burlington Memorial Hosp. v. Bowen, 644 F.Supp. 1020, 1026 (W.D.Wis.1986) (outlining the reimbursement schemes under the PSRO system). The indirect administrative costs of delegated hospital review, on the other hand, were reflected in the later calculation of the PPS rates.[16] See, e.g., 42 C.F.R. Sec. 466.62(c)(1) (1982); see also Burlington, 644 F.Supp. at 1026. Also, the indirect administrative costs incurred by PSROs were reimbursed through yearly appropriations. See, e.g., Burlington, 644 F.Supp. at 1026. Once Congress replaced the PSRO system with the PROs, all of the "direct" costs of review which had been incurred by the delegated hospitals (undertaking reviews) or PSROs (undertaking nondelegated review) were shifted to the PROs.[17] The PRO Payment Rule was designed to reimburse PROs directly for these direct costs of their review activities and, importantly, for their indirect administrative costs which had previously been covered only by yearly appropriations.[18] The rule was not created to compensate hospitals because they no longer had direct costs of review and their indirect costs were already covered by the PPS rates.
 
 
 19
 Furthermore, we reject the Hospitals' contention that Sec. 1320c-8 is the statutory authority for Trust Fund payments to PROs. The language of this section and its location within the statutory scheme make clear that it was intended to authorize the Secretary to use certain Trust Fund monies to cover her costs incurred in administering contracts with PROs. See note 14, supra, (quoting Sec. 1320c-8). Thus, the Hospitals' argument that the Secretary's interpretation of the PRO Payment Rule would produce duplicative payments or render it superfluous is insupportable. In addition, because their proffered explanation for how PROs are paid for their review services is incorrect, the Hospitals have failed to explain how PROs are actually funded under their interpretation of the statute. We therefore are not persuaded that deference to the Secretary's interpretation is inappropriate.[19]
 
 
 20
 It should be noted that we need not reach the issue of whether some additional costs incurred by hospitals in PRO review are not covered under the PPS. As the Secretary admits, photocopying and mailing costs are not reimbursed through the PPS because they were not indirect costs incurred under the PSRO review system; the Photocopy Rule was adopted in part for this reason. There may be other costs hospitals incur in complying with PRO requirements that were not incurred under the PSRO system. Yet our concern with the scope of PPS reimbursements is limited only to determining whether the Secretary could explain her interpretation of the PRO Payment Rule in the general context of the Medicare reimbursement scheme. Because the Secretary's interpretation adequately conforms to the PRO Payment Rule's statutory language, legislative history, and the history and general character of the PSRO and PRO reimbursement structures, we must accord deference to her view, regardless of whether a few specific review-related expenditures may not be currently reimbursed to the hospitals.
 
 
 21
 B. Inconsistencies in the Secretary's Position
 
 
 22
 The Hospitals also contend the Secretary's interpretation of the statute is invalid because it is inconsistent with her previous positions and presented for the first time in this litigation. Citing Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983), they state that this Court may not accept counsels' post hoc rationalizations for the Secretary's actions. Specifically, they argue that, in previous litigation and in a number of rulemaking proceedings, the Secretary has acknowledged, directly or by implication, that the PRO Payment Rule was the basis for additional payments to hospitals for costs incurred under agreements with PROs.[20] Most importantly, the Secretary cited Sec. 1395cc(a)(1)(F) as the statutory authority for the Photocopy Rule, which clearly indicates that she previously construed the statute as paying hospitals for their review costs. See, e.g., 57 Fed.Reg. at 47,786.[21]
 
 
 23
 Many of the inconsistencies cited by the Hospitals do not hold up under scrutiny. The Secretary has not maintained a contrary construction in previous cases. In Burlington, for example, the Secretary specifically alleged that Sec. 1395cc(a)(1)(F) was meant to ensure PROs would be adequately funded and that PPS is the sole source of photocopy costs associated with peer review. 644 F.Supp. at 1030. Also, merely because the Secretary claimed in the alternative in Burlington and at other times that photocopy costs should not be reimbursed twice, does not mean that the Secretary interpreted the PRO Payment Rule as a mechanism for reimbursing hospitals. See, e.g., id. Moreover, because the other cited cases involved different issues and unique postures, they provide little guidance as to whether the Secretary previously interpreted the PRO Payment Rule differently.[22]
 
 
 24
 In the rule-making record, however, the Secretary did state that Sec. 1395cc(a)(1)(F) is the statutory authority for the proposed Photocopy Rule. See, e.g., 57 Fed.Reg. at 47,786. This kind of reference implies that the Secretary at one time may have viewed the PRO Payment Rule as a means for reimbursing hospitals. As the Secretary points out, however, the record contains contrary statements of statutory authority as well. See 57 Fed.Reg. 47,787; note 19, supra.
 
 
 25
 Nevertheless, even if these scattered statements suggest that the Secretary has been somewhat inconsistent in her view of the PRO Payment Rule, such past inconsistencies cannot override the plain language of the statute. Moreover, even if we again assume the statute is ambiguous, the Secretary's inconsistency is probably insufficient alone to invalidate her interpretation. In Good Samaritan Hospital v. Shalala, --- U.S. ----, ----, 113 S.Ct. 2151, 2161, 124 L.Ed.2d 368 (1993), the Supreme Court recently declared in the Medicare context that the consistency of the Secretary's position is one "factor" in determining whether to accord deference. While the Court recognized that a current agency interpretation that conflicts with a previous one is often entitled to less deference, it also recognized that the agency " 'is not disqualified from changing its mind.' " Id. (quoting NLRB v. Iron Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 660-61, 54 L.Ed.2d 586 (1978)). Moreover, "where the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction." Id.
 
 
 26
 As discussed above, the Secretary's interpretation is a reasonable construction of the PRO Payment Rule's plain language, is supported by the legislative history and apparent congressional intent, and is explainable in terms of the history of the peer review system and reimbursement structure. Thus, her position is, at minimum, at least as plausible as the Hospitals'. The fact that scattered references in the rule-making record leave some doubt whether the Secretary's view of the statute has always been consistent is therefore insufficient to invalidate her construction.
 
 II.
 
 27
 The Hospitals do not appeal the district court's substantive conclusion that the Photocopy Rule is neither arbitrary and capricious nor procedurally defective. Rather, they now argue only that the district court lacked jurisdiction to rule on the merits of the Photocopy Rule, after convincing the court to the contrary below. Specifically, the Hospitals contend that because they failed to challenge the Photocopy Rule before the Provider Reimbursement Review Board, they failed to meet the exhaustion requirements of 42 U.S.C. Sec. 1395oo, which they claim provides the exclusive jurisdictional basis for judicial review. Thus, they would have us reverse the district court's apparent conclusion that it had federal question jurisdiction under 28 U.S.C. Sec. 1331 over their challenges to the validity of the Photocopy Rule.
 
 
 28
 The Secretary understandably objects to the Hospitals' tactics and insists they should not be able to raise this issue after arguing to the contrary twice below. However, this Court has an obligation to address sua sponte whether the federal courts have subject matter jurisdiction. See, e.g., Jablonski by Pahls v. United States, 712 F.2d 391, 395 (9th Cir.1983). Nevertheless, the Secretary also argues she can waive the exhaustion requirement, and chooses to do so here, given the status and unique posture of this case.
 
 
 29
 Whether the district court could invoke federal question jurisdiction under Sec. 1331 over the Hospitals' challenges to the validity of the Photocopy Rule, or whether the Sec. 1395oo route is indeed exclusive, raises a close question of some difficulty.[23] We find that we need not reach this issue, however, because the Secretary's waiver of the exhaustion is sufficient to vest jurisdiction in the district court under Sec. 1395oo.
 
 
 30
 It is clear Medicare's administrative exhaustion requirements are jurisdictional in nature, and hence, a district court cannot merely waive them for equitable or other policy reasons. See, e.g., Salfi, 422 U.S. at 766, 95 S.Ct. at 2467. Yet the Supreme Court has clearly established that the Secretary can waive exhaustion. See, e.g., Mathews v. Diaz, 426 U.S. 67, 76-77, 96 S.Ct. 1883, 1889-90, 48 L.Ed.2d 478 (1976); Mathews v. Eldridge, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976); Salfi, 422 U.S. at 765-67, 95 S.Ct. at 2466-68.[24] In Eldridge, 424 U.S. at 330, 96 S.Ct. at 900, a Social Security benefits case, the Court stated that the Secretary may waive the exhaustion requirement if she is satisfied that "no further [administrative] review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer." The Court extended this principle to the Medicare context in Ringer, 466 U.S. at 617, 104 S.Ct. at 2022-23.[25] While the Ringer Court stated that the Secretary could waive exhaustion when she deems it "futile," the Court has left to the Secretary's discretion the determination whether utilization of further administrative procedures would be fruitful. See, e.g., Salfi, 422 U.S. at 766-67, 95 S.Ct. at 2467 ("While a court may not substitute its conclusion as to futility for the contrary conclusion of the Secretary, we believe it would be inconsistent with the congressional scheme to bar the Secretary from determining in particular cases that full exhaustion of internal review procedures is not necessary...."); see also Schoolcraft v. Sullivan, 971 F.2d 81, 85 n. 7 (8th Cir.1992) (stating that the Supreme Court has explained that the Secretary has discretion to decide when to waive the exhaustion requirement), cert. denied, --- U.S. ----, 114 S.Ct. 902, 127 L.Ed.2d 93 (1994). In fact, the Secretary need not articulate her reasons for waiving exhaustion, and may even do so involuntarily, through a mistake or omission.[26] Moreover, the Court has only found deference to the Secretary inappropriate when she has insisted exhaustion is necessary, and, due to special circumstances, the claimants would not receive full redress or proper review if they were required to exhaust. See Eldridge, 424 U.S. at 330-32, 96 S.Ct. at 900-01 (concluding that because an erroneous termination of a Social Security recipient's benefits would not be recompensable through retroactive payments, deference to the Secretary's determination that he must exhaust administrative remedies was not appropriate).
 
 
 31
 Thus, because the Secretary wishes to waive the exhaustion requirements of Sec. 1395oo, and has determined that requiring exhaustion at this late stage in the litigation will not be helpful in resolving the merits issues, we find jurisdiction in this case under the Medicare statute. We cannot accept the Hospitals' contention that the Secretary's waiver comes too late, given the fact that their claim of no jurisdiction also arose for the first time on this appeal. We therefore reject the Hospitals' contention that the district court's judgment as to the validity of the Photocopy Rule must be vacated on jurisdictional grounds. Because the Hospitals did not properly appeal on the merits of that judgment, the court's conclusions must be affirmed.
 
 
 32
 AFFIRMED.
 
 
 
 *
 Donna E. Shalala succeeded Louis W. Sullivan, M.D., as Secretary of Health and Human Services in January 1993. Pursuant to Federal Rule of Appellate Procedure 43(c)(1), her name is substituted as appellee in this suit
 
 
 **
 Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 In 1983, Congress established a new Medicare reimbursement system, the PPS, which pays most hospitals according to a standard rate-per-discharge for over 450 treatment categories. See generally 42 U.S.C. Sec. 1395ww(d). This rate is based on costs from the fiscal year ending in 1981 and upward adjustments for inflation and other factors each year thereafter. See, e.g., 48 Fed.Reg. 39,752, 39,763-64 (1983). Indirect administrative costs of peer review under the old peer review system (the "PSRO" system discussed in note 2, infra ) were included in the calculation of the 1981 cost base. If a hospital did its own peer review, its direct cost was to be funded separately from the Medicare trust fund. Those hospitals that Congress exempted from PPS coverage ("non-PPS hospitals") continued to be reimbursed on a reasonable cost basis (derived from their actual costs of treating Medicare patients)
 
 
 [2]
 In 1972, Congress established the Professional Standards Review Organization ("PSRO") program to provide peer review of the quality and medical necessity of services furnished to Medicare beneficiaries. Under this program, the PSRO either performed the reviews itself for nondelegated hospitals or, much more commonly, delegated review to individual participating hospitals. Delegated hospitals had their direct costs of review reimbursed from the Medicare Trust Fund on a cost-per-unit basis through the PSROs, serving as "fiscal intermediaries." Both delegated and nondelegated hospitals had their indirect administrative costs reimbursed through the Medicare Cost Report, as part of the "administrative and general cost center." PSROs performing nondelegated reviews were likewise reimbursed from the Medicare Trust Fund for their direct costs, but their indirect administrative cost were reimbursed through yearly appropriations
 
 
 [3]
 The Hospitals claim the Secretary has now abandoned this view, but the Secretary continues to insist that such costs are indeed reimbursed through the PPS, with one exception. The Secretary now admits that photocopy costs and related mailing charges are not reimbursed through the PPS. Because PSRO review were almost always performed on-site (at the hospital), the photocopying of medical records was not necessary. Copying and mailing costs therefore were not among the indirect costs included in the calculation of the 1981 base year figure. The Secretary's adoption of the Photocopy Rule, discussed infra, was in response to this realization and a number of court decisions
 
 
 [4]
 The Hospitals contend that the Secretary changed her position on this issue. They argue strenuously that, for years, the Secretary maintained that the PRO payment scheme provides for payments to hospitals for the costs in question. See Part I(B), infra
 
 
 [5]
 On October 5, 1992, the Hospitals were certified as a class consisting of all hospitals that have participated in the Medicare program at any time since July 1, 1991
 
 
 [6]
 Previously, the Secretary had required hospitals to pay for their own photocopying expenses. In Burlington Memorial Hospital v. Bowen, 644 F.Supp. 1020, 1032 (W.D.Wis.1986), a district court struck down this requirement after concluding it was unsupported by the administrative record. Partially in response to this and other court decisions, the Secretary adopted the Photocopy Rule. As previously discussed, the Secretary now concedes that the photocopying costs associated with PRO review activities are not covered by the PPS because copies of records and related mailing costs were not required for on-site review under the PSRO. We also note that the Photocopy Rule does not apply to non-PPS hospitals. Non-PPS hospitals are not covered under the rule because their photocopying and other indirect costs associated with peer review are reimbursed directly along with all of their reasonable costs associated with treating Medicare patients
 
 
 [7]
 The Hospitals allege a variety of such costs, such as personnel costs in providing data not contained within medical records, dealing with PRO questions, providing space, and pursuing appeals
 
 
 [8]
 The Hospitals further argue "this subchapter," refers to 42 U.S.C. Sec. 1395, which is generally concerned with payments to the "providers of services."
 
 
 [9]
 The Secretary also responds that Sec. 1395cc(a)(1)(F) facially imposes but one of the many "conditions of participation" in the Medicare program. It contains no substantive provider payment provision; rather, the PRO Payment Rule, located within a parenthetical in this section, simply ensures that the PRO review activities will be adequately funded. The rest of Sec. 1395cc(a) supports this interpretation because the other subsections merely provide other conditions of participation and impose no payment requirements
 
 
 [10]
 That hospitals have never had their Medicare expenses reimbursed from yearly appropriations appears uncontested on the face of this record
 
 
 [11]
 See, e.g., 42 U.S.C. Secs. 1302 and 1395hh(a)(1) (granting to the Secretary the general authority to prescribe rules and regulations which provide interpretations of the Medicare statutes and to carry out the administration of the Medicare program)
 
 
 [12]
 For example, the House Report states that "[PRO] reviews would be covered as a hospital cost of care under Part A, but the PRO would be paid by the Secretary on behalf of the hospital on the basis of a rate per review established by the Secretary." House Report at 486-87 (emphasis added). The language of this passage suggests, as the Secretary does, that although PRO review costs are viewed as hospital expenses, the PROs will receive the reimbursement in lieu of the hospitals' paying the PROs and subsequently receiving a reimbursement for such payments
 
 
 [13]
 Senator Durenberger, in discussing the purpose of the PRO Payment Rule, stated as follows:
 With this amendment, it is possible to fund peer review organization activities without the uncertainty associated with the appropriation process. The costs of peer review, both direct and administrative, are deemed to be costs incurred in providing inpatient services under part A. While not included in the prospective rates, the Secretary, on behalf of the hospital, would be required to pay for these costs out of the hospital insurance trust fund. In addition, as a minimum, hospital insurance trust funds would be paid to PRO's [sic] at no less than the rates per review established in fiscal year 1982 for both direct and administrative costs adjusted for inflation.
 Id.
 
 
 [14]
 Section 1320c-8, entitled "Authorization for use of certain funds to administer the provisions of this part," provides as follows:
 Expenses incurred in the administration of the contracts described in section 1395y(g) of this title shall be payable from--
 (1) funds in the Federal Hospital Insurance Trust Fund; and
 (2) funds in the Federal Supplementary Medical Insurance Trust Fund,
 in such amounts from each of such Trust Funds as the Secretary shall deem to be fair and equitable after taking into consideration the expenses attributable to the administration of this part with respect to each of such programs. The Secretary shall make such transfers of moneys between such Trust Funds as may be appropriate to settle accounts between them in cases where expenses properly payable from one such Trust Fund have been paid from the other such Trust Fund.
 
 
 [15]
 As previously discussed, the legislative history surrounding Congress's adoption of the PRO system lends little support to the Hospitals' view of the purpose of the PRO Payment Rule
 
 
 [16]
 Non-PPS hospitals' indirect costs associated with peer review continued after the establishment of the PROs to be reimbursed on a reasonable cost basis
 
 
 [17]
 Although the Hospitals contend they still incur "direct" costs associated with PRO review, they have failed to demonstrate how they incur such costs when they no longer undertake delegated reviews. They are also unable to point to a definition of direct costs that conflicts with the Secretary's
 
 
 [18]
 Thus, the Secretary's explanation conforms to the Senator Durenberger's statement of the purpose of the PRO Payment Rule; namely, it serves to shield peer review reimbursement from uncertainty by providing stable funding for PROs' direct and indirect administrative costs within the Medicare system and thereby removing any dependence on appropriation statutes. See 129 Cong.Rec. 6859; note 13, supra. In addition, the PRO Payment Rule served another streamlining purpose in that it did away with the previous, cumbersome procedure of having hospitals pay PSROs for the direct costs of nondelegated review, only to have Medicare then reimburse the hospital
 
 
 [19]
 The Hospitals also contend that the PRO Payment Rule is the only possible statutory authority for the Photocopy Rule, which demonstrates that the statute is intended as a means for reimbursing hospitals. As the Secretary points out, however, statutory authority for Photocopy Rule reimbursement scheme can also be found in 42 U.S.C. Secs. 1302, 1395hh, and 1395ww(d). Sections 1302 and 1395hh grant general rulemaking authority to the Secretary to administer the Medicare program. See also 57 Fed.Reg. at 47,787 (citing these provisions as authority for the regulation containing the Photocopy Rule). Section 1395ww(d) grants general authority to the Secretary to make additional payments under the PPS
 
 
 [20]
 See, e.g., Beverly Hosp. v. Bowen, 872 F.2d 483, 485 (D.C.Cir.1989); Burlington, 644 F.Supp. 1020, 1028-29; American Hosp. Ass'n v. Bowen, No. 86-1487-A, 1987 WL 108978 (E.D.Va. July 13, 1987)
 
 
 [21]
 In addition, the Hospitals argue the Secretary's position always had been that the PRO Payment Rule requires payments to hospitals (through the PROs), but that these payments were often unnecessary because the costs were also paid under the PPS and were not large enough to be paid separately. See 53 Fed.Reg. at 8657
 
 
 [22]
 For example, in Beverly Hosp., 872 F.2d at 485-87, the only issues remaining on appeal were a jurisdiction question and the proper form of retrospective relief
 
 
 [23]
 The third sentence of 42 U.S.C. Sec. 405(h) states in pertinent part that "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 ... of Title 28 to recover on any claim arising under this subchapter." In Weinberger v. Salfi, 422 U.S. 749, 756, 95 S.Ct. 2457, 2462, 45 L.Ed.2d 522 (1975), the Supreme Court characterized Sec. 405(h) as a "sweeping and direct" prohibition against judicial review of benefits decisions outside of the procedures established in the Social Security Act. Section 405(h), is incorporated into the Medicare Act by 42 U.S.C. Sec. 1395ii. Heckler v. Ringer, 466 U.S. 602, 614, 104 S.Ct. 2013, 2021, 80 L.Ed.2d 622 (1984). The administrative review procedures for Medicare reimbursements are contained in Sec. 1395oo. This section essentially requires all hospitals which are dissatisfied with the level of their Medicare reimbursements to seek review before the PRRB. See, e.g., Sec. 1395oo(a). Hospitals (and other providers) can then obtain judicial review of the PRRB's decision, or a subsequent reversal, affirmance, or modification by the Secretary. Sec. 1395oo(f). They can also seek judicial review of questions of law or regulations "whenever the [PRRB] determines ... that it is without authority to decide the question." Id. Thus, the key issue for determining if the Hospitals' challenge to the validity of the Photocopy Rule must proceed through the administrative review as outlined in Sec. 1395oo, or if district court can invoke Sec. 1331 jurisdiction, is whether their challenge "arises under" the Medicare Act
 
 
 [24]
 There is also a nonwaivable requirement that "a claim for benefits shall have been presented to the Secretary." Ringer, 466 U.S. at 617, 104 S.Ct. at 2022-23 (quoting Eldridge, 424 U.S., at 328, 96 S.Ct. at 899). We find, as the Court did in Ringer, that the relief the Hospitals request "is that the Secretary change her policy" so as to ultimately receive greater reimbursements. See 466 U.S. at 614, 104 S.Ct. at 2021. Thus, their claim is, "at bottom," a claim for benefits (provider reimbursements). See id. at 614, 617, 104 S.Ct. at 2021, 2022-23. Moreover, as the Court found in Salfi and Eldridge, the fact that the Hospitals failed to raise their validity challenge with the Secretary is not controlling. See Eldridge, 424 U.S. at 329-30, 96 S.Ct. at 900; Salfi, 422 U.S. at 767, 95 S.Ct. at 2467. Because the Secretary's adoption of the Photocopy Rule was an agency decision, and the PRRB does not have the power to review such a decision, see Sec. 1395oo, the Hospitals need not have presented their claim to the Secretary before the PRRB. See, e.g., Eldridge, 424 U.S. at 329-30, 96 S.Ct. at 900. Thus, the Hospitals' claim satisfies the nonwaivable requirement
 
 
 [25]
 Although Ringer is a Medicare benefits case, rather than a reimbursement case, and thus, the judicial review provision at issue in that case is Sec. 405(g) rather than Sec. 1395oo(f), Heckler's conclusion applies equally to this context. See, e.g., V.N.A. of Greater Tift County, Inc. v. Heckler, 711 F.2d 1020, 1029 n. 7 (11th Cir.1983) (quoting Rhode Island Hosp. v. Califano, 585 F.2d 1153, 1158 (1st Cir.1978) and stating that Sec. 1395oo(f) is the "functional equivalent" of Sec. 405(g)). These sections provide parallel requirements: both Sec. 405 and Sec. 1395oo outline administrative hearing procedures for reaching a "final decision," and Secs. 405(g) and 1395oo(f) state that there must be such a "final decision" of the Secretary before judicial review may be sought. The Court's conclusion that the requirement of a "final decision" may be waived by the Secretary therefore applies equally to the reimbursement context
 
 
 [26]
 In Diaz, 426 U.S. at 76, 96 S.Ct. at 1889-90, for example, the Court found that the Secretary's stipulation that the case was ripe for disposition by summary judgment by the district court to be a waiver. The Court concluded that "the Secretary's submission of the question for decision on the merits by the District Court satisfied the statutory requirement of a hearing and final decision." Id. at 77, 96 S.Ct. at 1890. Also, in Salfi, 422 U.S. at 767, 95 S.Ct. at 2467-68, the Court made a similar determination:
 In the present case the Secretary does not raise any challenge to the sufficiency of the allegations of exhaustion in appellees' complaint. We interpret this to be a determination by him that for the purposes of this litigation the reconsideration determination is "final."